**Robert Lee WILSON, Plaintiff-Appellee,**

v.

**Irvin T. TAYLOR, as Acting Chairman and Examiner, Civil Service Board, Winter Park, Florida, et al., Defendants-Appellants.**

No. 83-3299.

United States Court of Appeals, Eleventh Circuit.

June 11, 1984.

Frederic B. O'Neal, Winter Park, Fla., for defendants-appellants.

Stephen A. Weinstein, Orlando, Fla., for plaintiff-appellee.

Before FAY, VANCE and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

In this case, we decide what relief is available in a suit brought under 42 U.S. C.A. § 1983 (West 1974) by a police officer fired from his police department without procedural due process and allegedly in contravention of his first amendment right of association. We affirm the decision of the trial court as to all matters except the award of $100,000 for alleged injury due to procedural due process violations.

### Background

Robert Lee Wilson joined the Winter Park, Florida, police department in June, 1971. During that year, Wilson began dating Susan Blackburn, the adopted daughter of Harlan Blackburn, a convicted felon reputed to be a key figure in organized crime in central Florida. Wilson knew that Susan was related to Harlan Blackburn, and he knew that Harlan Blackburn was a convicted felon and a reputed member of organized crime. In May, 1975, Wilson met with Harlan Blackburn when he and Susan drove Blackburn from the Avon Park Correctional Institution to Winter Park and when they twice dined at the family home.

Wilson relayed the fact that he had met Harlan Blackburn to his superiors in the police department. At one meeting with his superiors, Wilson promised not to see Susan Blackburn again. A short time after making this promise, Wilson called his Deputy Chief and reneged on his promise not to see Susan Blackburn again. On June 13, 1975, Chief Beary informed Wilson that he was fired. Prior to his discharge, Wilson was not given any formal notice of the charges against him nor any opportunity to respond to those charges.

Following his discharge, Wilson appealed to the city of Winter Park's Civil Service Board. On August 5, 1975, the Board voted to rescind the termination notice effective upon the completion of a thirty-day disciplinary suspension of Wilson. Chief Beary, without formal notice to Wilson, appealed the Civil Service Board decision to the city of Winter Park City Commission. After a public hearing, also held without formal notice to Wilson, the Commission voted to overrule the Civil Service Board and reinstated Chief Beary's dismissal order. Wilson filed this lawsuit.

The district court found that Wilson's procedural due process rights had been violated and ordered the Winter Park officials

to hold a remedial hearing. After the court-ordered hearing, the city of Winter Park reaffirmed Wilson's discharge. The district court granted the officials' motion for summary judgment, holding that Wilson was discharged because of his association with a known felon. The district court rejected Wilson's claim that his first amendment right of association had been infringed. The district court, in effect, ruled that Wilson had been discharged not because of his association with Susan Blackburn, but because of his association with Harlan Blackburn. The district court held that any violations of Wilson's procedural due process rights had been cured through the remedial hearing. Wilson's case was appealed to the Fifth Circuit in *Wilson v. Taylor*, 658 F.2d 1021 (5th Cir. Unit B 1981). The Fifth Circuit vacated the district court's judgment concluding that a genuine issue of fact existed as to why Wilson was discharged.

Upon remanding the case to the district court, the court of appeals advised the district court that if a substantial factor for dismissing Wilson was his continuing association with Susan Blackburn, and if Wilson would not have been discharged had he not reneged on his promise not to again see Susan Blackburn, then the district court would have to determine whether the association with Susan Blackburn was protected by the first amendment. *Wilson*, 658 F.2d at 1028. On March 10, 1983, after a jury trial, the district court entered judgment for Wilson and against the city in the amount of $286,429.64. In addition, the district court awarded Wilson $35,000 in attorney's fees and $3,000 in costs. The total award for Wilson in his suit against the city thus amounted to $324,429.64.

The jury, in special interrogatories, concluded that (1) Wilson had been discharged by Chief Beary due to his relationship with Susan Blackburn, (2) Chief Beary was delegated the final or ultimate authority to discharge Wilson and to decide why he should be discharged, and (3) Chief Beary had been delegated the final or ultimate authority concerning any due process procedures to be accorded to Wilson.[1] The

---

1. The complete list of interrogatories and their answers are shown below:

Paragraph 1, do you find from a preponderance of the evidence that a substantial motivating factor in Chief Beary's decision to discharge Plaintiff was Plaintiff's refusal not to see Susan Blackburn again? Answer yes or no.

Yes. ·

Note, if your answer to question 1 above was yes, go to question 2. If your answer was no, go to question 9.

Question 2, do you find from a preponderance of the evidence that in discharging Plaintiff, Chief Beary was motivated by a belief that future association with Susan Blackburn would necessarily result in Plaintiff associating with Harlan Blackburn? Answer yes or no.

No.

Note, if your answer to question 2 above was yes, go to question 3. If your answer was no, go to question 4.

Question 3, do you find from a preponderance of the evidence that Plaintiff's continuing association with Susan Blackburn presented an undue risk of future association with Harlan Blackburn? Answer yes or no.

There is no answer.

Note, if your answer to question 3 above was yes, go to question 9. If your answer was no, go on to question 4.

Question 4, do you find from a preponderance of the evidence that, regardless of his refusal not to see Susan Blackburn again, Plaintiff would have been discharged anyway because of his past and possible future association with Harlan Blackburn? Answer yes or no.

No.

Note, if your answer to question 4 above was yes, go on to question 9. If your answer was no, go on to question number 5.

Question number 5, do you find from a preponderance of the evidence that the City of Winter Park, Florida delegated to Chief Beary the final or ultimate authority to discharge Plaintiff and to decide why he should be fired? Answer yes or no.

Yes.

Note, if your answer to question 5 above was yes, go on to question 7. If your answer was no, go on to question 6.

Question 6, do you find from a preponderance of the evidence that a substantial or motivating factor in the City Commission's decision to ratify Chief Beary's discharge of Plaintiff was Plaintiff's refusal not to see Susan Blackburn again? Answer yes or no.

Unanswered.

Note, if your answer to question 6 above was yes, go on to question 7. If your answer was no, go on to question 9.

Question 7, what sum or sums of money do you find from a preponderance of the evi-

district court denied the city's various motions for directed verdict, motions for new trial, and motions for judgment notwithstanding the verdict.

## Discussion

### Right of Association

■ "A fundamental proposition in our constitutional jurisprudence is that government employment may not be conditioned upon a relinquishment of a constitutional right, including the rights to speech and association guaranteed under the first amendment." *Wilson*, 658 F.2d at 1027. In examining whether an individual was fired for a reason infringing upon a constitutional right, courts have applied the test set forth by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

dence to be the total amount of Plaintiff's damages proximately caused by his discharge? Answer in dollars.

A, backpay, including base pay, degree pay, career pay, overtime pay, certification pay, $128,129.64.

B, benefits, including retirement, health and medical insurance, education allowances, paid vacation, death benefits, Social Security contribution, loss of interest on savings, $18,300.

C, future losses, including damage to career, loss of future income, damage to personal reputation, loss of future benefits, $40,000.

Note, if you indicated sums of money in response to question 7 above, go on to question 8. If you did not, go on to question 9.

Question 8, do you find from a preponderance of the evidence that the Plaintiff failed to seek out or take advantage of a business or employment opportunity that was reasonably available to him under all the circumstances shown by the evidence, and if so, what is the amount he would reasonably have realized had he taken advantage of such opportunity? Answer in dollars.

No answer is listed.

Part 2, question 9, do you find from a preponderance of the evidence that, at the time of Plaintiff's discharge, the City of Winter Park, Florida had delegated to Chief Beary the final or ultimate authority concerning whether Plaintiff was to receive, prior to his discharge, formal notice of the charges against him and an opportunity to respond to those charges? Answer yes or no.

Yes.

Note, if your answer to question 9 above was yes, go on to question 11. If it was no, go on to question 10.

Question 10, if you find that the City of Winter Park, Florida had not delegated such final or ultimate authority to Chief Beary, do you find from a preponderance of the evidence that the City Commission of the City of Winter Park, Florida, decided to either authorize or ratify Chief Beary's actions of not giving Plaintiff formal notice of the charges against him and opportunity to respond to those charges? Answer yes or no.

Unanswered.

Note, if your answer to question 10 above was yes, go on to question 11. If it was no, go on to question 12.

Question 11, what sum or sums of money do you find from a preponderance of the evidence to be the total amount of Plaintiff's mental anguish and emotional distress damages which were solely caused by his failure to receive formal notice of the charges against him and an effective opportunity to respond to those charges prior to his discharge? Amount in dollars, $50,000.

Note, go on to question 12.

Question 12, do you find from a preponderance of the evidence that, at the time of Chief Beary's appear [sic] to the City Commission, the City of Winter Park, Florida, had delegated to Chief Beary the final or ultimate authority concerning what notice, if any, was to be given of such an appeal to Plaintiff? Answer yes or no.

Yes.

Note, if your answer to question 12 above was yes, go on to question 14. If your answer was no, go on to question 13.

13, do you find from a preponderance of the evidence that, at the time the City Commission ratified Plaintiff's discharge, they also ratified Chief Beary's action of not providing Plaintiff with formal notice of Chief Beary's appeal to the City Commission? Answer yes or no.

Not answered.

Note, if your answer to question 13 above was yes, go on to question 14. If it was no, stop here and do not answer question 14.

Question 14, what sum of money do you find from a preponderance of the evidence to be the total amount of Plaintiff's mental anguish and emotional distress damages which were solely caused by his failure to receive notice of Chief Beary's appeal to the City Commission? Amount in dollars.

$50,000.

So say we all, date, March 8, 1983, signed S. Arnold Smead, Jury Foreman.

Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the board's decision not to rehire him. Respondent having carried that burden, however, the district court should have gone on to determine whether the board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. In this case, the jury found that Wilson's association with Susan Blackburn constituted a substantial factor in his being fired from the police department, and found that he would not have been fired in the absence of that association. The key question becomes, therefore, whether Wilson's association with Susan Blackburn is constitutionally protected. Although Wilson argues that his relationship with Susan Blackburn entailed discussions of philosophical beliefs and other social issues, we view the issue as though Wilson and Susan Blackburn were simply dating.[2] We must, therefore, determine whether dating is a type of association protected by the first amendment's freedom of association.

█ The Supreme Court stressed in *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958), that the freedom to engage in association for the advancement of beliefs and ideas is a basic part of the fourteenth amendment due process guarantee of liberty. "Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *NAACP v. Alabama,* 357 U.S. at 460–61, 78 S.Ct. at 1170–71.

The courts have strongly held that freedom of association is no longer tied merely to an advancing of political beliefs.

By limiting the power of the states to interfere with freedom of speech and freedom of association, the fourteenth amendment protects all persons no matter what their views or means of expression. It is too late in the day to doubt that this freedom of association extends only to political or conventional associations and not to the social or the unorthodox.

*Bruns v. Pomerleau,* 319 F.Supp. 58, 64–65 (D.Md.1970). Contrary to the argument raised by the city of Winter Park, the courts have expanded upon the *NAACP v. Alabama* interpretation of the first amendment freedom of association. The concept of freedom of association has grown to include more than associations which are for the purpose of advancing shared beliefs.

The Fifth Circuit adopted an expansive view of an individual's first amendment right of association in *Sawyer v. Sandstrom,* 615 F.2d 311 (5th Cir.1980). The court concluded that an overly broad anti-loitering ordinance violated an individual's first amendment right of association.

The appellant in this case was not charged with possessing narcotics, or with any other breach of the peace; his only "criminal" act was to *associate* with certain individuals, knowing that they were unlawfully using or possessing illegal drugs. Appellant has been convicted under the loitering ordinance for apparently innocent activity; his conviction clearly infringes on the free exercise of his associational rights.

*Sawyer,* 615 F.2d at 316. Under *Sawyer,* the first amendment right to associate is not limited merely to those instances where two or more individuals meet to advance shared beliefs. *Sawyer* teaches that one's first amendment right to associate encompasses the right to simply meet with others. If, indeed, the right of freedom of

**2.** Evidence in this record would support a finding by the trial court or a jury that Wilson and Susan Blackburn were engaged in discussions of philosophical and social issues as well as dating. The jury was never asked to address that issue (dating or philosophical discussions) by special interrogatory, and the trial judge made no finding on the issue.

association applies to individuals meeting on the public streets, it must also apply to a man and a woman who are dating.

As with the *Sawyer* court, the court in *McKenna v. Peekskill Housing Authority*, 497 F.Supp. 1217 (S.D.N.Y.1980), *modified,* 647 F.2d 332 (1981), held that freedom of association is not limited merely to those situations where an advancing of common beliefs occurs.

> More recent cases have properly recognized that the First Amendment also applies to social and personal associations, including those which do not purport to express and advocate ideas. For example, in *Tyson v. New York City Hous. Auth.*, 369 F.Supp. 513 (S.D.N.Y.1974), Judge Metzner held that public housing tenants had a cause of action under the right of association when they were threatened with eviction because of acts committed by adult children who did not live with them. As Judge Metzner explained:
>
>> The nub of this claim is that by declaring these tenants ineligible for continued occupancy on the basis of their children's acts, the defendants have acted "solely from the fact of association" by the plaintiffs with their children.... Such a claim, if proven, would run afoul of the First Amendment which guarantees to every person the right to freely associate with others, including members of his family.
>
> *Id.* at 520.

*McKenna*, 497 F.Supp. at 1221. The relevant question is not whether individuals wish to advance common beliefs, but whether they wish to associate with others.

> This court agrees that the first amendment's protection for freedom of association extends to private and social associations, even when the aggregation of persons has no hortatory purpose.... Simply because a group, or even a pair, of persons has not distilled the fruits of

> their relationship into a body of thought or into a political programme, government interference with their interaction nonetheless implicates the first amendment. Just as vocal, assertive people invoke the constitution to safeguard their freedom of expression, silent people should be able to invoke it to protect their silence.

*McKenna*, 497 F.Supp. at 1221.

We follow *Sawyer* and align ourselves with recent cases holding that the first amendment freedom of association applies not only to situations where an advancing of common beliefs occurs, but also to purely social and personal associations. Using the rationale in *Sawyer, Bruns,* and *McKenna*, we conclude that the relationship between Wilson and Susan Blackburn was protected under the first amendment freedom of association. Contrary to the argument offered by the city, freedom of association does not come into play merely when an advancing of common beliefs by the individuals in question exists. Where two individuals seek to associate with each other, without any evidence of promulgating and advancing political or religious beliefs, they are protected under the freedom of association provision.

 It is the interaction, the association, which is protected. The protection does not come into play only when two or more individuals seek to distill the fruits of their relationship into a body of thought or into a political program. *McKenna*, 497 F.Supp. at 1221. A state violates the fourteenth amendment when it seeks to interfere with the social relationship of two or more people. We conclude that dating is a type of association which must be protected by the first amendment's freedom of association. Wilson's right to date Susan Blackburn falls under his right of freedom of association. We further conclude that Wilson was fired for a reason infringing upon his constitutionally-protected freedom of association.[3]

---

**3.** This is a narrow holding. We do not hold that a law enforcement officer may never be fired because of associations with others. *Shawgo v. Spradlin*, 701 F.2d 470 (5th Cir.), *cert. denied,*

— U.S. ——, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). (The court upheld the right of a police department to punish a male and female officer for off-duty dating and alleged cohabitation,

## Liability

■ The city contends that even if Wilson's freedom of association rights were violated, it cannot be held liable. The Supreme Court in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) set down a standard upon which individuals could recover from municipalities in section 1983 actions.

> We conclude, therefore, that a local government may not be sued under section 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under section 1983.

*Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. The Eleventh Circuit, in analyzing the *Monell* standard for municipal liability, concluded:

> The former Fifth Circuit has interpreted this standard of liability to mean that "in those areas where the official 'is the final authority or ultimate repository of [city] power, his official conduct and decisions must necessarily be considered those of one whose edicts and acts may fairly be said to represent official policy.'" *Schneider v. City of Atlanta*, 628 F.2d 915, 920 (5th Cir.1980), quoting *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir.1980)).

*Hearn v. City of Gainesville*, 688 F.2d 1328, 1334 (11th Cir.1982).

Based upon our earlier analysis of the freedom of association question, we conclude that Chief Beary unconstitutionally dismissed Wilson. Under *Monell*, however, the city may be held liable only if Chief Beary had the final or ultimate authority within the local government to make the decision or take the action which caused the violation. The city contends that since an appellate process existed through which Wilson could appeal his termination, it follows that Chief Beary did not have the final authority to terminate Wilson. According to the city, it was the City Commission, not Chief Beary, who had and exercised the final authority to terminate Wilson. The jury, however, in answering question five of the special verdict, found from a preponderance of the evidence that the city of Winter Park, Florida, delegated to Chief Beary the final authority to terminate Wilson and to decide what conduct was sufficient to justify termination.

The city contends that the district court erred in not directing a verdict on Wilson's first amendment substantive claim because no evidence was presented to indicate that Chief Beary had the final authority to terminate Wilson.

The Fifth Circuit set forth the standard governing directed verdict motions in *Boeing Company v. Shipman*, 411 F.2d 365 (5th Cir.1969).

> If the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the mo-

---

finding "a rational connection between the exigencies of Department discipline and forbidding members of a quasi-military unit, especially those different in rank, to share an apartment or to cohabit." *Shawgo*, 701 F.2d at 483.) *See also Gasparinetti v. Kerr*, 568 F.2d 311 (3rd Cir.1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978). (The court, although concluding that certain police regulations were unconstitutionally overbroad, did recognize "a significant government interest in regulating some speech of police officers in order to promote efficiency ... and instill public confidence in the law enforcement institution."

*Gasparinetti*, 568 F.2d at 315–16.) In this case, the city of Winter Park made the argument that dating was not protected under the first amendment freedom of speech provision. The city did not make the argument that even if dating were protected under the freedom of association provision of the first amendment, a law enforcement officer's rights under that provision could be curtailed due to the nature of police work. We choose not to render an advisory opinion on what conduct would be sufficient for termination of a police officer who associates with certain felons, indicted individuals, suspects, or their relatives.

tions, that is, evidence of such quality and weight that reasonable and fair minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.

*Boeing*, 411 F.2d at 374. The record is rife with evidence from which a jury could conclude that Chief Beary had the final authority to terminate a police officer. James E. Harrison, a former police officer in Winter Park, testified: "Chief Beary did take the final burden. He always has while I was there." Wilson, in discussing the power of Chief Beary to terminate an officer, stated:

The Chief of Police runs the Department. If the Chief says you are fired, you are fired.... The Chief of Police has the sole and absolute authority within the Department to command it and run it and he has the authority to fire.... I knew at that time that the Police Chief had the sole authority to fire me at that time, and I accepted that as a termination.

Based upon the testimony of these individuals, the jury concluded that Chief Beary possessed final authority to terminate Wilson. This substantial evidence also justified the district court's denial of the motion for directed verdict.

The city argues that the existence of an appeals process to review termination decisions, by necessity, implies that Chief Beary's termination of Wilson was not final. Case law does not support this position. It must be remembered that an appeal did not automatically follow a decision by Chief Beary to terminate an officer. The duty was upon the terminated officer, in this case Wilson, to appeal the termination to the Civil Service Board. If the officer chose not to appeal, Chief Beary's termination would not be reviewed.

In *Bowen v. Watkins*, 669 F.2d 979 (5th Cir.1982), the court examined the question of whether an official exercised final authority to make certain decisions even when those decisions were reviewable through an appeals process. In *Bowen*, the Chief of Police had recommended that an individual be promoted. Following a protest by several other officers, the City Council rescinded the promotion. The Police Chief then filled the vacancy in question. After several officers filed a section 1983 suit, the City Council ratified the chief's decision. A question faced by the Fifth Circuit was whether the Chief of Police exercised final authority even though his decisions were reviewable by the city council. The court stated:

Thus the question becomes one of identifying the official who has authority to make policy; then municipal liability attaches to acts performed pursuant to that policy. When an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy. See *Schneider v. City of Atlanta*, 5 Cir. 1980, 628 F.2d 915, 920; see generally Schnapper, Civil Rights Litigation After Monell, 79 Colum.L.Rev. 213, 213–21 (1979). If a higher official has the power to overrule a decision but as a practical matter never does so, the decision maker may represent the effective final authority on the question. Finally, even if there is an appeal of an action but the appellate body defers in substantial part to the judgment of the original decision maker, the original decision may be viewed as the government's policy. *Id.* at 219, 223. These questions of the division of authority between Chief of Police Watkins, who initiated promotions and whose recommendations were uniformly accepted prior to the rescission of Pickens's promotion, and the City Council, which held at least a veto power and exercised it in the rescission, are pre-eminently factual and are for decision by the trial judge in the first instance.

*Bowen*, 669 F.2d at 989–90.

It is, thus, clear that even where an appellate process exists to review an official's decision, that official may be held to exercise final authority within the city. As in *Bowen*, an official may exercise such authority even when the appellate body occasionally reverses one of his decisions. In this case, even though an appellate pro-

cess exists in Winter Park, and the Civil Service Board initially reversed Chief Beary's termination decision, the jury could conclude that Chief Beary continued to exercise final authority regarding termination decisions. The jury's conclusion that Chief Beary exercised this final authority was supported by substantial evidence and was a factual decision properly left to the jury.

The Eleventh Circuit in *Berdin v. Duggan,* 701 F.2d 909 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983), concurred with that portion of the *Bowen* decision which held that an official may exercise final authority even when his actions are subject to review by an appellate body.

Florida City also argues that Duggan was not the final authority of administrative decisions but, rather, was answerable to the City Commission. The question of whether the city delegated to the mayor the final authority to make personnel decisions is a question of fact for the trial judge in the first instance.... We note the district court's finding that "the mayor was clothed with the authority to actually make the firing decision. Not only is this clear from the evidence of the authority that had been granted him under the type of government that the city operated, but because the evidence otherwise shows that all it took was the mayor to say, 'Get your stuff and go, you are fired,' that is what happened and the city closed him out." *Duggan,* 701 F.2d at 914. The district court's denial of the city's motion for directed verdict on Wilson's first amendment substantive claim was clearly proper.

### Procedural Due Process

With respect to Wilson's claim of procedural due process violations in the pre-termination and post-termination phases, the city contends that it is not liable for any damages incurred by Wilson. The city seeks to rely upon *Monell* for its claim that it is not liable for the acts or omissions by Chief Beary in violating Wilson's procedural due process rights. The jury, however, in response to question nine of the special verdict, concluded, from a preponderance

of the evidence, that at the time of Wilson's discharge, the city of Winter Park, Florida, had delegated to Beary the final authority on whether Wilson was to receive, prior to termination, formal notice of the charges against him and an opportunity to respond to those charges. In response to question twelve of the special verdict, the jury concluded, from a preponderance of the evidence, that at the time of Chief Beary's appeal to the City Commission, the city of Winter Park, Florida, had delegated to Chief Beary the final authority concerning what notice, if any, was to be given of such an appeal to Wilson. The record lends support to the jury's findings that Chief Beary possessed the final authority concerning not only the termination of police officers, but also the procedure to be employed. As set forth in the *Berdin* and *Bowen* decisions, we conclude that the jury's determination that Chief Beary exercised final authority is a factual decision properly left to the jury. We conclude that the district court's denial of the city's motion for a directed verdict on the procedural due process issue was correct.

### Damages

The Supreme Court analyzed the question of damage recovery for procedural due process violations in *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). It held that in the absence of proof of actual injury caused from procedural due process violations, plaintiffs are entitled to recover only nominal damages. *Carey,* 435 U.S. at 248, 98 S.Ct. at 1044. The earlier *Wilson* panel, in interpreting the *Carey* decision, held:

> *Carey v. Piphus* makes it clear that if a plaintiff can prove actual damages resulting solely from the deprivation of procedural due process, the plaintiff is entitled to damages.... One of the elements of damage that Supreme Court indicated was recoverable for denial of procedural due process was for mental and emotional distress. The Court was careful to note that such damage may not be presumed, but must be proved by the plaintiff.

*Wilson*, 658 F.2d at 1032–33. The jury, in response to questions eleven and fourteen, determined that Wilson suffered mental anguish and emotional distress damages caused solely by his failure to receive certain due process procedures. The jury awarded $50,000 in mental anguish and emotional distress damages for each of the two procedural due process violations.

Contrary to the city's claim, we find that the record amply supports the jury's conclusion that Wilson suffered damages resulting solely from the two violations. John Fisher testified that Wilson became very upset, quite angry, and emotionally disturbed because of "the manner in which they terminated him." Evidence of damage due to the pre-termination procedural due process violations was also related by John David Hartsfield who testified, "He was upset that he was not aware of what they were doing and he had not been advised of what was happening." Wilson's father testified that Wilson was very upset when he found out that he was not given notice of the appeal to the City Commission.

Following the trial, the city moved for a new trial contending that the jury's determination of the amount of mental anguish and emotional upset damages were excessive and the product of the jury's passion or prejudice against the city. The city contended that the award of damages bore no rational relationship to any anguish or upset caused solely by any deprivation of Wilson's procedural due process rights. The jury awarded $50,000 for the pre-termination procedural due process violations and $50,000 for the procedural due process violations occurring during the appeals process. The district court denied the city's motion for a new trial.

The Fifth Circuit in *Rosiello v. Sellman*, 354 F.2d 219 (5th Cir.1965), set down a standard upon which an appellate court reviews a trial court's denial of a new trial motion based upon a claim of excessive damages.

> The refusal to grant a new trial, sought on the ground of inadequate or excessive damages, is a matter within the sound discretion of the trial judge, whose action thereon should be overturned only in exceptional circumstances. In a long line of cases this court has consistently emphasized that "the granting or denial of a new trial on the ground of excessive [or inadequate] damages is a matter of discretion within the trial court, not subject to review except for grave abuse of discretion." *Houston Coca-Cola Bottling Co. v. Kelley*, 131 F.2d 627, 628 (5th Cir.1942) .... We are fully aware of the equally well settled principle that circuit courts are duty-bound to reverse the trial judge's refusal of a new trial where the judge has, as a matter of law, abused his discretion.

*Rosiello*, 354 F.2d at 219–20 (footnote omitted.)

The Second Circuit in *Dagnello v. Long Island Rail Road Co.*, 289 F.2d 797 (2d Cir.1961), examined the power of a circuit court to review the exercise of discretion by the trial judge in refusing to grant a new trial on the ground of alleged excessiveness of the verdict.

> Just as a trial judge is not called upon to say whether the amount is higher than he personally would have awarded, so are we appellate judges not to decide whether we would have set aside the verdict if we were presiding at the trial, but whether the amount is so high that it would be a denial of justice to permit it to stand. We must give the benefit of every doubt to the judgment of the trial judge; but surely there must be an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law.

*Dagnello*, 289 F.2d at 806. The Supreme Court in *Grunenthal v. Long Island R. Co.*, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), in examining the *Dagnello* decision, concluded that courts in determining whether a verdict is excessive look to whether it is "grossly excessive, inordinate, shocking to the judicial conscience, outrageously excessive, so large as to shock the conscience of the court, [or] monstrous." *Grunenthal*, 393 U.S. at 159, n. 4, 89 S.Ct.

at 333, n. 4 (quoting *Dagnello,* 289 F.2d at 802). This court concludes, after carefully reviewing the evidence, that the award of $100,000 for the procedural due process violations is grossly excessive.

Evidence was presented concerning mental anguish and emotional distress incurred by Wilson because of the procedural due process violations. Although evidence was presented to indicate the existence of damage, based upon a careful review of the record, any damage incurred by Wilson was slight. Wilson testified that he felt frustration and ultimate betrayal when the city denied him the required due process procedures. In his testimony concerning the post-termination procedural due process violations, Wilson testified:

Q. When you read that newspaper article that morning, that Sunday morning, how did you feel?

A. Again, like I said, I was, first of all, very—I felt betrayed first again, because first of all, they couldn't follow obviously what was our own established procedures and policies. They were again sneaking behind my back. Then I got angry to the point that I got so upset that I called the Mayor on the telephone, and like I said, accused him of holding a matter without my notice.

Q. Did you feel any mental anguish?

A. I was mentally frustrated at that point.

Later in his testimony, Wilson stated that he felt frustration, anger, humiliation, and embarrassment because of the way he was fired. In reviewing the damage incurred by Wilson, we must concentrate on those damages incurred by Wilson solely due to the procedural due process violations and not those caused by the firing itself. Other witnesses testified that Wilson was "very down and out" due to the manner in which he was terminated. John Fisher testified concerning Wilson's condition due to the procedural due process violations. "He was very, very upset, very distressed, emotionally upset, emotionally disturbed, very volatile, angry." Although these witnesses stressed the emotional strain incurred by Wilson due to the procedural due process violations, the most relevant evidence concerning Wilson's damages comes from Wilson himself. Wilson testified that he was frustrated and angry due to the procedural due process violations. He does not discuss nor relate any extreme emotional damage or injury incurred because of the manner in which he was terminated. We must then conclude that the injuries incurred by Wilson from the procedural due process violations were slight. The mere fact that Wilson was angry or frustrated from the procedural violations, alone, is insufficient basis for a jury award of $100,000.

In reviewing the district court's denial of the new trial motion based upon the alleged excessiveness of damages, we have made a detailed appraisal of the evidence bearing on damages. *Grunenthal,* 393 U.S. at 159, 89 S.Ct. at 333. We conclude that the amount of damages awarded to Wilson for the procedural due process violations was an amount so high that it would be a denial of justice to permit it to stand. *Dagnello,* 289 F.2d at 806. The evidence does not support an award of $100,000 for the mental anguish and emotional distress suffered by Wilson from the procedural due process violations.

Although in many cases a court will grant a new trial where the award of damages by the jury is excessive, the court may, in its discretion, "use the remittitur practice whereby it denies the defendant's motion for new trial on condition the plaintiff remits a stated amount." 6A Moore's Federal Practice ¶ 59.08[6] (2d ed. 1983). Courts have stressed that no legal obstacle exists to the exercise by a circuit court of the power to review the exercise of discretion by the trial judge in denying a new trial motion based upon a claim of excessive damages and to resort to remittitur in proper cases. *Dagnello,* 289 F.2d at 804. The Fifth Circuit has held: "If the passion, prejudice, caprice, undue sympathy, arbitrariness or more taints only the damage award and not the liability assessment, the proper response is a remittitur or a new trial addressed to damages alone." *Edwards v. Sears, Roebuck and Co.,* 512 F.2d 276, 282 (5th Cir.1975).

We conclude that sufficient evidence exists to support the jury's finding of the substantive and procedural violations. We find, however, that the award of $100,000 for the two procedural due process violations is grossly excessive. We find that a proper award to Wilson for the procedural due process violations would have been $5,000 for each violation, thus, totalling $10,000 for the procedural violations. *Howell v. Marmpegaso Compania Naviera, S.A.*, 536 F.2d 1032, 1034–35 (5th Cir.1976).

This case is remanded to the trial court with directions to require a remittitur to the extent of $90,000, or, at the option of Wilson, to grant a new trial on the question of damages sustained by Wilson from the procedural due process violations. *Natco, Inc. v. Williams Brothers Engineering Co.*, 489 F.2d 639, 641 (5th Cir.1974).

### Other Claims

■ The city's claims that the trial court committed harmful error in (1) allowing Wilson to re-raise the issue of whether his pre-termination conduct vis-a-vis Harlan Blackburn constituted a violation of the city's civil service rules and regulations, (2) allowing Wilson to interject the issue of whether his rights under Florida Statutes 112.531–534 ("the Policeman's Bill of Rights") had been violated, and (3) not limiting the chronological scope of plaintiff's cross examination of Chief Beary to the chronological scope of that witness's direct examination are meritless. Likewise, the city's contention that the court abused its discretion in not ordering a new trial on the basis that the verdict was contrary to the manifest weight of the evidence is also meritless. Finally, we conclude that the court did not err in not reducing the backpay awarded Wilson by the amount of other income received by him after his initial termination by Chief Beary.

### Conclusion

In the context of how this case was litigated, Wilson's freedom of association rights were violated when he was terminated because he was dating Susan Blackburn. Beary, the individual who terminated Wilson and who caused the procedural due process violations, was delegated the final or ultimate authority by the city to make these determinations. We reverse and remand because the award of $100,000 for the procedural due process violations is grossly excessive. We hold that a proper award to Wilson for the damages he incurred from the procedural due process violations would have been $10,000. The case is remanded to the trial court with directions that it require a remittitur in the amount of $90,000 or, at the option of Wilson, order a new trial solely on the question of damages incurred by Wilson from the procedural due process violations.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FAY, Circuit Judge, concurring in part and dissenting in part:

While agreeing with most of the majority opinion, I respectfully dissent from that section labeled Damages. Judge Hatchett has set forth fully the facts and law surrounding the issues presented. The claims for damages flowing from the denials of due process were fully supported by the evidence and properly submitted to the jury. The jury responded with specific awards for specific claims. The trial judge reviewed the awards and affirmed. Obviously, the trial judge was not "shocked" by the amounts and neither am I. There is nothing excessive about $100,000 being awarded for this type of conduct. Even civil employees have rights. Even police officers are entitled to the full protection of the law.

In my opinion the majority has merely substituted its subjective thoughts on money damages for the considered opinions rendered by the jury and trial judge. Such is not the function of appellate judges. I would affirm the judgment in toto.