Brenda Griffin **TOOLE, et al., Plaintiffs,**

v.

**Richmond C. McCLINTOCK, Jr., M.D., et al., Defendants.**

**Civ. A. No. 90–H–195–S.**

United States District Court, M.D. Alabama, S.D.

Nov. 26, 1991.

---

Rufus R. Smith, Jr., Farmer, Price, Smith, Hornsby & Weatherford, Dothan, Ala., and Doffermyre, Shields & Canfield, Everette L. Doffermyre and K. Christine Harrelson, Atlanta, Ga., for plaintiffs.

James R. Seale, Robinson & Belser, Montgomery, Ala., and Patrick J. Lamb, Bonita Stone, Synde B. Keywell, Constance A. Caldwell, Katten, Muchin & Zavis, Chicago, Ill., for defendant Baxter.

Richard B. Garrett, Rushton, Stakely, Johnston & Garrett, Montgomery, Ala., for defendant Dr. Richmond C. McClintock, Jr.

## MEMORANDUM OPINION

HOBBS, District Judge.

Plaintiffs Brenda Griffin Toole and J. Michael Toole filed this action February 22, 1990 against defendants Dr. Richmond C. McClintock, Jr. and Baxter Healthcare Corporation.[1] On July 30, 1991, following a five-day trial, a jury returned a verdict in favor of the plaintiffs and against defendant Baxter Healthcare Corporation.[2] The jury awarded Brenda Toole $350,000 in compensatory damages and $5,000,000 in punitive damages.[3] This case is now before the Court on defendant Baxter's motion for judgment notwithstanding the verdict, for a new trial, or in the alternative, for remittitur of either or both the compensatory and the punitive damages. The plaintiffs have also filed several motions, including a motion to increase the award of punitive damages,[4] a motion to declare Alabama Code § 6–11–21 inapplicable to the case at hand or to declare it unconstitutional, and a motion to declare Alabama Code section § 6–11–3 unconstitutional.[5] A hearing was held on these matters on October 30, 1991.

## JUDGMENT NOT WITHSTANDING THE VERDICT

### A. STANDARD OF REVIEW

The defendant has moved for a judgment not withstanding the verdict as to the compensatory damages and the punitive damages awarded Brenda Toole. The standard to be applied by this Court in considering this motion was set forth in *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable [people] could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of

---

1. Plaintiffs also named Heyer–Schulte, an unincorporated wholly owned subsidiary of American Hospital Supply Corp., American Hospital Supply Corp., Baxter Travenol Laboratories, Inc., and Travenol Laboratories, Inc. as defendants. These defendants will be collectively referred to as "Baxter." Baxter Healthcare Corp. is the successor in interest to American Hospital Supply. Baxter stipulated at trial that, as the successor corporation, it would be liable to the extent that liability was found to exist on the part of Heyer–Schulte, the manufacturer of the products involved in this case.

2. The jury did not find Dr. McClintock liable.

3. It also awarded Michael Toole $50,000 in compensatory damages for his loss of consortium.

4. The seventh amendment prohibits additur in the federal courts. *See Dimick v. Schiedt,* 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935).

5. Both of these statutes are part of the Alabama Tort Reform Act. Most of its provisions have not yet received extensive review by the Alabama courts. For an overview of the tort reform package, see Hunter, *Alabama's 1987 Tort Reform Legislation,* 18 Cumb.L.Rev. 281 (1988).

such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co.*, 411 F.2d at 374–75, *quoted in Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir.1990).

### B. EVIDENCE AT TRIAL

■ In April 1981, Dr. McClintock performed a surgical procedure in which he placed two Heyer–Schulte silicone gel-filled breast implants in Brenda Toole. In late 1987, Ms. Toole experienced pain in her breasts and noticed that the implants were hardening and becoming distorted. When she returned to Dr. McClintock, he determined that a fibrous capsule of scar tissue had formed around each implant. This condition occurs in about 40% of women who undergo this type of breast implant operation.

In order to loosen this capsule, Dr. McClintock performed a closed capsulotomy, which involves applying force and squeezing the breasts. Following the closed capsulotomy, Ms. Toole continued to have problems and consulted a plastic surgeon, Dr. Robert Zaworski. Dr. Zaworski determined that the implants had ruptured and he performed an open capsulotomy, a surgical procedure in which the doctor makes an incision into the breast. Since the open capsulotomy, Brenda Toole has

had several operations to remove granulomas (silicone lumps) from her breasts.

Breast implants can be made with either silicone gel or with a saline solution. The silicone gel-filled implants feel and appear more natural and are used more often. However, it is undisputed that they are more hazardous than the saline-filled version. If a gel-filled implant ruptures, the silicone can leak into the breast and form granulomas whereas if a saline implant ruptures, any leaking saline is absorbed harmlessly by the body.

At trial, the plaintiffs presented evidence which demonstrated that the silicone gel-filled implants were likely to rupture when pressure was applied to them, as with a closed capsulotomy. Several medical witnesses, including doctors who were called by Dr. McClintock, agreed with Dr. McClintock that a closed capsulotomy is the procedure most commonly used by doctors when treating the problems of pain and hardening of the implant due to scar tissue.

The plaintiffs also called Mr. Thomas Talcott, a former Heyer–Schulte employee and director of its materials division. Talcott testified that in his opinion the implant is unreasonably dangerous because the shell is weak and the gel too free-flowing. He also testified that in some cases, the silicone gel had not only leaked into the breast, but had migrated to other parts of women's bodies.

■ The testimony most damaging to Baxter was that of its own witness, Mr. Edmund Seder. Seder, a former vice-president of Heyer–Schulte who is still employed by Heyer–Schulte as a consultant, is the person who knew the most about the product. He testified that he would never recommend a closed capsulotomy because the Heyer–Schulte implant is too fragile and too likely to rupture.[6] However, the warning provided by Heyer–Schulte which accompanied the implant stated only that "Heyer–Schulte Corporation cannot guarantee the structural integrity of its implant should the surgeon elect to treat capsule

6. Talcott agreed with this assessment.

firmness by forceful external stress." Plaintiffs' Exhibit 50.[7]

Dr. Gregory Windham, another defense witness called by Dr. McClintock, testified that if the alternative procedure for the formation of scar tissue, an open capsulotomy, was performed, it would be even more likely that the implant would rupture—a risk not even mentioned in the product's warning.[8] Dr. Windham also testified that on each of three occasions when he performed open capsulotomies, the implant ruptured. Dr. Gordon Robinson, who was also called by Dr. McClintock, commented that the Heyer–Schulte thin-walled implants had a tendency to rupture after a number of years, a fact which he said he learned from experience, not from the manufacturer's warning. Dr. Robinson also stated that on one occasion he had ruptured a patient's silicone implant while performing a capsulotomy and was forced to remove 80% of her breast as a result.

The jury was instructed that, under Alabama law, a manufacturer who makes a product which can be reasonably anticipated to be dangerous is under a duty to exercise care to give reasonable and adequate warning of any dangers known to the manufacturer or which in the exercise of reasonable care the manufacturer should have known and which the user of the product could not have known. The manufacturer is liable for injuries proximately caused by its failure to warn. The jury was also told that under the "learned intermediary" doctrine, the manufacturer did not have to warn Ms. Toole about the dangers of its product, but only had to warn Dr. McClintock.[9]

Heyer–Schulte management knew that the product was likely to rupture when pressure was applied. It also knew that physicians were routinely performing an operation in which such pressure was applied, and, in fact, continue to perform this procedure today. The jury could reasonably conclude that the warning provided to physicians by Heyer–Schulte did not properly convey the risks of the closed capsulotomy.

Heyer–Schulte management also knew that when an implant ruptured, the silicone could leak into the breast tissue and cause granulomas. However, Heyer–Schulte warned of this risk on its product insert. No doctor disputed the source of Brenda Toole's condition. Dr. Robinson and Dr. Hamner testified that if the implant ruptures, the doctor probably could not remove all of the silicone.[10]

From Dr. Robinson's testimony, the jury could reasonably find that there were serious dangers attendant to the rupturing of an implant. Also, it was reasonable for the jury to conclude that, if the rupture of an implant were no more consequential than it appeared from the Heyer–Schulte product insert, there would have been no need for

---

7. The product insert did mention in other places that the implant envelope had a thin tear strength; that if the implant tore, silicone could leak into the breast tissue; and that granulomas could form if the implant ruptured. Certainly, these warnings were not as clear or as forceful as Seder's statement that performing a closed capsulotomy is not a procedure that could be safely recommended. It was reasonable for the jury to conclude, as the majority of physicians evidently did, that what Heyer–Schulte's warning really meant was that if the doctor were relatively careful, he or she could still safely perform a closed capsulotomy.

Defendant Baxter argues in its post-trial motions that since Seder is not a physician, he is not qualified to give his opinion that a closed capsulotomy should never be attempted. The Court accepts this argument to the extent that there may be times when a closed capsulotomy is the only proper medical choice. This does not affect the weight given by the jury to the testimony of the defendant's witness who knew the most about the product when he stated that, in his opinion, the product was too fragile to withstand the most widely used medical procedure for the treatment of the formation of scar tissue around the implant.

8. The product insert warned doctors that the implant would easily rupture if it were cut with a scalpel. It did not mention this risk in connection with the performance of an open capsulotomy.

9. The defendant does not complain that the jury instructions were inaccurate or misleading or in some other way incorrect.

10. Dr. Windham testified that he thought it was possible to remove all of the silicone, although it would be a difficult and time-consuming procedure.

Dr. Robinson to have removed 80% of a patient's breast.

■ Thus, a jury could reasonably find that Heyer–Schulte's failure adequately to warn doctors of a foreseeable risk about which it had actual knowledge was the proximate cause of Ms. Toole's injuries.[11] The Court finds that the jury's verdict was not against the weight of the evidence. Accordingly, defendant Baxter's motion for judgment notwithstanding the verdict is denied. Defendant Baxter's motion for a new trial is conditionally granted in accordance with the damages discussion below.

## EXCESSIVENESS OF THE VERDICT

### A. COMPENSATORY DAMAGES

■ In its verdict, the jury awarded Brenda Toole a total of $350,000 in compensatory damages, divided as follows: $100,-000 in past damages and $250,000 in future damages. The defendant argues that this verdict was excessive because no substantial evidence was presented which linked Heyer–Schulte's implant with an increased risk of cancer or immune system diseases and because Brenda Toole's fears of future disease are illusory and unreasonable.[12]

The Court must first determine whether the jury's award of compensatory damages is "grossly excessive." *Wilson v. Taylor,* 733 F.2d 1539, 1548 (11th Cir.1984). The *Wilson* court describes such a verdict as one so high that it "would be a denial of justice to permit it to stand." *Id.* at 1548–49.

Brenda Toole has already incurred actual medical costs of close to $15,000. The remainder of the award of past damages is for her mental distress and anguish. The Court cannot find that the jury's award as

---

**11.** Baxter claims that it was reversible error for the Court to allow the introduction of certain letters received by Heyer–Schulte which contained complaints about breast implants. It claims that these letters were irrelevant because they addressed problems with the implant which were not substantially similar to the problems experienced by Ms. Toole and because they were received after Ms. Toole's implants were manufactured. These issues were debated at length before the trial and during the trial. The plaintiffs removed the material not related to the fragility of the implants. The Court gave a curative instruction, written by the defendant, cautioning the jury that the letters were not to be considered for the truth of the statements they contained, but only inasmuch as they indicated that the defendant had notice about the fragility of the implants and the likelihood of their rupture. The letters were relevant, therefore, as evidence of a fact which the defendant does not dispute, and which its witness conceded; i.e., that the implants are very fragile and are likely to rupture if pressure is applied. Moreover, although letters were received after the manufacture of the implants, they were received well before the rupture of Brenda Toole's implants.

Baxter also contends that the Court erred when it allowed the plaintiff to introduce as its exhibit 68 a report issued by the FDA in May 1990 because the report contains inadmissible hearsay. *See* General and Plastic Surgery Devices; Effective Date of Requirement for Premarket Approval of Silicone Gel–Filled Breast Prosthesis; Proposed Rule, 55 Fed.Reg. 20568 (1990) (to be codified at 21 C.F.R. § 878). Again, this issue was discussed extensively both before trial and during the trial. The Court

found that the report was admissible under Fed. R.Evid. 803(8)(C) because it was the product of a factual investigation conducted by the FDA pursuant to its statutory authority. *See* 21 U.S.C. § 355(b). While the report did indicate that further studies were ongoing, the report stated: "FDA has evaluated the risks associated with the implantation of silicone gel-filed breast prostheses. FDA now believes that the following are significant risks associated with the use of the silicone gel-filled breast prosthesis." There follows a number of the risks identified by Heyer–Schulte in its insert provided to doctors along with its breast implants. The risks may be more explicit in the FDA report and the FDA report may discuss certain risks not enumerated in the insert provided to doctors, but the FDA report is sufficiently reliable to be deemed admissible under Fed.R.Evid. 803(8)(C).

It should be noted that the defendant submitted a sequel to this report as its exhibit 172. *See* General and Plastic Surgery Devices; Effective Date of Requirement for Premarket Approval of Silicone Gel–Filled Breast Prosthesis; Final Rule, 56 Fed.Reg. 14628 (1991) (to be codified at 21 C.F.R. § 878). This report contains rebuttals to some of the items on the FDA's list of risk factors associated with the breast implants found in the earlier report.

**12.** The Alabama Supreme Court has recently found that the provisions of the Alabama Tort Reform Act which govern the structuring of settlements unconstitutionally interfere with the right to a trial by jury as guaranteed by the Alabama Constitution, Article I, § 11. *See Clark v. Container Corp.,* 589 So.2d 184 (Ala.1991). Thus, Alabama Code § 6–11–3 is no longer applicable in this case.

to Ms. Toole's past damages is grossly excessive. Brenda Toole had to undergo the closed capsulotomy performed by Dr. McClintock as well as the open capsulotomy performed by Dr. Zaworski. The silicone which escaped from the implant forms lumps which, although now known to be benign, could not be distinguished from malignant lumps merely by feeling them. Brenda Toole testified that she suffered a great degree of mental distress when she discovered the lumps and feared that they were cancerous. She has had three operations to remove these lumps and has experienced the pain and suffering attendant to these surgical procedures.

As to the award of future damages, it is possible that Brenda Toole will have to have surgery again at some time in the future, perhaps more than once. She faces the uncertainty and worry of having lumps develop in her breasts and the pain and expense of having these lumps surgically removed.

However, the great weight of the evidence was to the effect that she does not face an increased risk of other, more serious, diseases. The plaintiffs called Dr. Shanklin who testified that the silicone which escaped from the implants could cause cancer or a disease of the immune system, such as lupus, rheumatoid arthritis, or scleroderma. However, the evidence shows that Dr. Shanklin nearly alone among the medical community believes that there is a connection between escaped silicone and the development of cancer. The defendant pointed out that while over two million women have had breast augmentation surgery and while a number of them have had ruptured implants, no evidence has emerged which demonstrates that women whose implants have ruptured experience a higher rate of cancer. None of the other medical experts who testified at trial believed, based on current scientific

knowledge, that Brenda Toole had a higher risk of developing cancer as a result of the escaped silicone than a woman who had not had such an operation.[13]

As to disorders of the immune system, Dr. Terence Phillips, an immunologist, testified that, in his opinion, Brenda Toole's immune system had not been affected by the migrating silicone, except to the extent that granulomas had formed. He further testified that he thought it unlikely that there was a connection between migrating silicone and immune system malfunction, although he was reluctant, as a scientist, to completely rule out that possibility. Dr. Robinson and Dr. McCarty both testified that they did not know of any reliable evidence which supported Dr. Shanklin's views on the increased risk of autoimmune diseases.[14]

■■■ Also, the jury awarded Michael Toole $50,000 in compensatory damages on his loss of consortium and services claim. Consortium is the right of a husband to his wife's company, fellowship, cooperation, and assistance in the marital relationship. When awarding damages, the jury is instructed to take into account the length of time of such a loss and the reasonably certain duration of any future loss. Based on the evidence presented by the plaintiffs, the jury's award of damages to Michael Toole was excessive. While Brenda Toole has had several operations, none of them have required long periods of recuperation during which her husband would have been deprived of her company, services, and assistance. In addition, as noted above, the great weight of the evidence shows that Brenda Toole is not likely to suffer devastating consequences in the future, although some surgery is a possibility. Thus, Michael Toole is unlikely to be deprived of his wife's company, services, and

---

13. Dr. McCarty also mentioned his ongoing study which involves nearly 4000 women. He stated that so far the study shows no increased risk of sarcomatous malignancy or of autoimmune diseases, such as rheumatoid arthritis, among women who have had breast implants.

14. As further testimony to their belief in the safety of the implant procedure, several doctors mentioned that their wives and daughters had breast implants, including, for example, Dr. McCarty's wife, who is a doctor herself. Ms. Toole currently has silicone gel-filled implants which were placed in her breasts by Dr. Zaworski after he performed the open capsulotomy.

assistance for substantial periods of time at some future date.

Brenda Toole failed to prove that she faces an increased risk of cancer or of autoimmune diseases. The Court finds that the jury's verdict as to future damages is excessive and should be reduced to $150,000, given that there is little evidence to support the plaintiff's contentions that she now runs so grave a risk of serious medical complications. The total amount of compensatory damages awarded to Ms. Toole should be $250,00 and the Court will order a new trial unless she agrees to a remittitur of compensatory damages of $100,000. In addition, because the evidence does not show that Brenda Toole is likely to develop serious medical complications, Michael Toole was unable to prove that he will be significantly deprived of his wife's companionship, services, or assistance in the future. Accordingly, the Court finds that the jury's verdict was excessive, and should be reduced by $25,000. The total amount of compensatory damages awarded to Michael Toole should be $25,000 and the Court will order a new trial unless plaintiff Michael Toole agrees to a remittitur of $25,000 in compensatory damages.

## B. PUNITIVE DAMAGES

In addition to compensatory damages, the jury awarded the plaintiffs $5 million in punitive damages. As the cause of action in this case arose after June 11, 1987, several provisions of what is commonly known as the Tort Reform Act apply.[15] Ala.Code § 6–11–30 (Supp.1990). Baxter first argues that no punitive damages should be assessed because it has not been proven sufficiently culpable. It also claims that the amount of punitive damages must be limited to $250,000 under the provisions of Alabama Code § 6–11–21. In the alternative, should that provision be found by the Court not to apply, Baxter contends that the amount awarded is excessive and has moved for remittitur.

### 1. *Punitive damages standard*

[8] In order to be entitled to receive punitive damages under Alabama law, a plaintiff must prove by "clear and convincing evidence" that a defendant "consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." Ala.Code § 6–11–20(a) (Supp.1990).[16]

Baxter claims that the plaintiffs have not met the standard. Because Heyer–Schulte included a warning with its product, it argues that it cannot be said to have exhibited "wantonness," defined by the statute as "conduct which is carried on with a deliberate disregard to the rights or safety of others." Ala.Code § 6–11–20(b)(3) (Supp. 1990).

The testimony of the former Heyer–Schulte vice-president, Seder, and of its former director of materials, Talcott, clearly indicates that the company had knowledge that the implants were likely to rupture when closed capsulotomies were performed. The jury could reasonably conclude that it also knew that serious consequences could result from such ruptures.

Baxter correctly claims that Heyer–Schulte did warn physicians that closed capsulotomies could result in a rupture of the implant.[17] It also warned that as a result of the rupture, silicone gel could escape and form granulomas. However, the evidence clearly shows that the jury was justified in finding these warnings inadequate; to this day, the closed capsulotomy is the procedure most commonly performed by physicians when scar tissue forms around the implant. A warning

---

**15.** *See supra* note 5. The Alabama Supreme Court has recently declared § 6–11–23(a) and part of § 6–11–23(b) unconstitutional because they interfere with the separation of powers provisions of the Alabama constitution. *Armstrong v. Roger's Outdoor Sports, Inc.,* 581 So.2d 414, 421 (Ala.1991). These provisions stated that there would be no presumption of correctness given to the jury's findings in regard to punitive damages and allowed the trial court to "independently assess" a jury verdict of punitive damages in the post-trial stage.

**16.** Each of the operative terms of the punitive damages standard is further defined in the statute. *See* Ala.Code § 6–11–20(b) (Supp.1990).

**17.** *See supra* note 7.

which is known to be ineffective in substantially deterring the hazardous procedure to which it is addressed could reasonably be considered inadequate by the jury.

Nor does Baxter seriously claim that Heyer–Schulte was unaware that the closed capsulotomy procedure continued to be utilized. The jury found that Heyer–Schulte consciously and deliberately engaged in wantonness with regard to Brenda Toole. The jury found that Heyer–Schulte demonstrated a conscious and deliberate disregard for the safety of Brenda Toole and other women seeking treatment because its management knew that the implants were likely to rupture and that the silicone could escape into the patients' bodies, but failed to warn physicians in such a way that their performance of closed capsulotomies would be deterred. The jury had a reasonable basis for describing, as it did, Heyer–Schulte's conduct as wanton.

Baxter admits that Heyer–Schulte failed to warn of the increased risks of cancer and immune system diseases.[18] However, Baxter contends that these risks are merely speculative. As stated above, the only evidence that Brenda Toole is at increased risk for cancer and immune system diseases is the testimony of Dr. Shanklin. Baxter, on the other hand, produced evidence which tended to show that the overwhelming majority of the medical establishment disagrees with Dr. Shanklin. It is clear that today, in 1991, the scientific basis for Dr. Shanklin's views is not generally accepted; in 1981, there was even less basis for a belief that a ruptured implant could cause cancer. Heyer–Schulte was not wanton in failing to warn of speculative and unproven risks.

2. *The statutory cap on punitive damages*

■ The punitive damages cap is found in Ala.Code § 6–11–21 (Supp.1990), which states:

An award of punitive damages shall not exceed $250,000.00, unless it is based upon one or more of the following:

(1) A pattern or practice of intentional wrongful conduct, even though the damage or injury was inflicted only on the plaintiff; or,

(2) Conduct involving actual malice other than fraud or bad faith not a part of a pattern or practice; or,

(3) Libel, slander or defamation.

Quite obviously, the jury's $5,000,000.00 punitive damages award greatly exceeds the $250,000.00 limit contained in § 6–11–21. Baxter maintains that this cap should be applied because Heyer–Schulte's conduct does not fall into one of the three categories of exceptions to the cap.[19]

The plaintiffs, however, claim that Heyer–Schulte engaged in a "pattern or practice of intentional wrongful conduct." The jury found this to be so. Heyer–Schulte management knew that a certain procedure should not be performed because of the fragility of the product but Heyer–Schulte continued to ship the implants, month after month, without a warning that stated in terms as certain as its knowledge, that this procedure had a very high risk of causing rupture of the implant with resulting leakage of the silicone to other areas of the body. It was reasonable for the jury to find that this continued activity over a period of years with an inadequate warning constituted a "pattern or practice" of intentional wrongful conduct within the exception to the cap.

3. *Reduction of punitive damages*

■ Because the Court has found that the jury's award of punitive damages was excessive, it must determine the appropriate remedy. The defendant has moved for

**18.** While the plaintiffs presented evidence that it is extremely difficult to remove all of the silicone from a woman's breast once the implant ruptures, and that the migrating silicone is likely to form granulomas which require surgical removal, facts which Baxter does not dispute, Baxter provided evidence that Heyer–Schulte warned of these risks. *See supra* note 7. There is no basis for the jury's award of punitive damages based on Heyer–Schulte's conduct in this respect.

**19.** The Alabama Supreme Court has not yet ruled on the constitutionality of this provision.

a new trial as to punitive damages or, in the alternative, for remittitur of the excess amount. This matter is left to the discretion of the Court. *See Wilson v. Taylor,* 733 F.2d at 1549. In the present situation, the Court finds that remittitur is an appropriate remedy.

The Alabama Supreme Court has established procedures for the review of a jury's award of punitive damages. *Green Oil Co. v. Hornsby,* 539 So.2d 218, 223–24 (Ala. 1989); *Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986). These factors, as listed in *Green Oil,* are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that has actually occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

(2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree on the defendant's awareness of any hazard which his conduct is likely to cause, and any concealment or "cover-up" of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

(3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profits and should be in excess of the profit, so that the defendant recognizes a loss.

(4) The financial position of the defendant would be relevant.

(5) All of the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

(6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

(7) If there have been other civil actions against the same defendant based on the same conduct, this should be taken into

account in mitigating the punitive damages award.

*Green Oil,* 539 So.2d at 223–24.

As to the first factor, Brenda Toole has failed to show that she has suffered or is likely to suffer the serious harm she claims will befall her. Although the plaintiffs' expert claims that she is likely to experience an increased risk of cancer or immune system diseases, there is little basis in fact for this contention. The award of $5,000,000 is excessive, given that the plaintiff has not shown that she has been or will be grievously harmed in this manner.

There is little doubt after the testimony of Seder and Talcott that Heyer–Schulte knew about the risks of the fragile, thin-walled silicone implant and continued to market the device while failing adequately to warn physicians of these dangers. This is certainly conduct of the sort which punitive damage awards seek to punish and deter. However, as Baxter points out, *it* has never manufactured or distributed breast implants. Heyer–Schulte is no longer in existence and has not manufactured breast implants since 1982. The deterrent effect of a large punitive award as to Baxter or Heyer–Schulte would therefore be nonexistent. The plaintiff points out that such an award would have a deterrent effect on other companies who still make implants similar to the one made by Heyer–Schulte and that the award of a large amount of punitive damages in order to deter others is an appropriate function of punitive damages. The Court and presumably the jury are aware that doctors are making large sums of money from the practice of inserting implants and are naturally reluctant to surrender this lucrative practice.[20] In fact, Dr. Robinson testified that he did not warn patients of all of the risks the implant operation entails. The manufacturers' warnings need to be clear and specific in order for the doctors to pass the information on to their patients in a meaningful way, even if the doctors are primarily motivated by fears of malpractice suits. For this reason, too, the jury had a basis for believing that the punitive dam-

---

**20.** Dr. McClintock testified that he performs    over 1,000 of these operations each year.

ages award had to be large enough to compel the manufacturer to spell out the hazards to the doctors so that they would be communicated to the patients. However, the Court concludes that a punitive award of $2,000,000 is fully capable of serving as a deterrent to others who are marketing products which are similarly unsafe or which have similarly inadequate warnings.[21] Accordingly, the Court finds that defendant Baxter's motion for a new trial as to punitive damages is due to be granted unless the plaintiff agrees to a remittitur of $3 million in punitive damages, leaving a punitive damages award of $2 million. The plaintiffs have one week from the date of this order to inform the Court of their intentions.

---

21. Both the third and fourth *Green Oil* factors concern the amount of the punitive damages in relation to the size and profitability of the corporation and neither suggests a reduction of the jury's verdict. A smaller award would be more in line with the reduction that a consideration of first two factors makes appropriate. The final two factors are not applicable here. There is no criminal case against Baxter and the only other lawsuit cited by the parties was apparently resolved in Baxter's favor. However, the Court finds that Baxter should have to bear the costs of litigation and will address this issue in a separate opinion.