959 So.2d 678 (2006)
CITY OF DOTHAN
v.
Mary Beth BRACKIN.
2050558.
Court of Civil Appeals of Alabama.
December 8, 2006.
*680 F. Lenton White, city atty., Dothan, for appellant.
Ishmael Jaffree, Mobile, for appellee.
CRAWLEY, Presiding Judge.
Mary Beth Brackin, a magistrate for the Dothan Municipal Court, was dismissed from her employment with the City of Dothan after having been found guilty of two major offenses under the City's Personnel Department Rules and Regulations ("the Personnel Rules"), namely: insubordination and negligence in carrying out assigned tasks, within 24 months of a previous major offense. Brackin appealed her dismissal to the City's Personnel Board, which affirmed the dismissal. Brackin then appealed the Personnel Board's affirmance of the dismissal to the Houston Circuit Court. The circuit court reversed the decision of the Personnel Board, and the City appealed to this court.

Standard of Review
"The trial court's review of the Board's decision is limited to `the record made before the Board and to questions of law presented, and that court must affirm the judgment of the Board if there is substantial evidence to support its findings.' City of Mobile v. Seals, 471 So.2d 431, 433 (Ala.Civ.App.1985). If there is substantial evidence to support the Board's determination, the trial court must affirm the Board's decision and may not substitute its judgment for that of the Board. Id. The trial court is not permitted to judge the wisdom of the decision of the Board. Creagh v. City of Mobile Police Dep't, 543 So.2d 698 (Ala.Civ.App.1989)."
City of Mobile v. Robertson, 897 So.2d 1156, 1159 (Ala.Civ.App.2004). Substantial evidence is "relevant evidence . . . that might be accepted by reasonable minds as adequate to support a conclusion." City of Mobile v. Trott, 596 So.2d 921, 922 (Ala. Civ.App.1991). In the administrative-law context, substantial evidence exists if there is "`a rational basis for the conclusions approved by the administrative body.'" City of Mobile v. Seals, 471 So.2d 431, 434 (Ala.Civ.App.1985)(quoting Ex parte Morris, 263 Ala. 664, 668, 83 So.2d 717, 720 (1955)). Thus, if the Personnel Board properly applied the law and there was substantial evidence to support its decision, the circuit court was bound to affirm its decision. City of Dothan Personnel Board v. Herring, 612 So.2d 1231, 1232-33 (Ala.Civ.App.1992). "`This court is likewise governed by the same standard as the [trial] court; if we conclude that substantial evidence existed to support the Board's decision, we must uphold it.'" City of Mobile v. Robertson, 897 So.2d at 1159 (quoting Creagh v. City of Mobile Police Dep't, 543 So.2d 698, 699 (Ala.Civ. App.1989)).

Factual Background
Brackin worked as a magistrate for the City from May 1992 until May 2005. During the time at issue in this case, Brackin's supervisor was Municipal Judge Rose Evans-Gordon. One of Brackin's job duties was to process uniform traffic tickets and complaints ("UTTCs") filed in the municipal *681 court. Brackin administered oaths to police officers, received tickets filed by the police officers, and accounted for those tickets on UTTC transmittal forms.
On April 22, 2004, Brackin received a 10-day suspension and 2 years' probation for violating § 3-42(6) of the Personnel Rules  action(s) or lack of actions(s) that could cause undue financial loss to the City  and § 3-42(14) of the Personnel Rules  insubordination  both of which are designated as major offenses. Brackin testified that both charges were based on the fact that she had informed a citizen who believed that he had been falsely arrested that he could file a complaint in the City clerk's office. On cross-examination, Brackin was asked whether she had informed the citizen that the warrant for his arrest had been wrongly issued and that his arrest was, therefore, illegal. Brackin denied giving the citizen that information. Brackin did not appeal her suspension to the Personnel Board.
Sometime in early 2005, another city magistrate, Mary Turner, was placed on administrative leave pending a police department investigation of allegations that Turner had "fixed" a traffic ticket issued by Cpl. Eric Duhaime of the Dothan police department to Stephen Phelps on November 24, 2002.[1] After Turner was placed on leave, Judge Evans-Gordon instructed all the other magistrates to cooperate fully with the investigation and "to strictly refrain from any contact with Ms. Turner." Brackin inquired whether the prohibition extended to after-hours contact with Turner because, she said, she and Turner attended the same church. The judge replied that the prohibition extended to any contact with Turner.
On April 29, 2005, Brackin was charged with two major offenses. The first was insubordination, based upon the allegation that Brackin had willfully disobeyed the judge's instruction to refrain from contact with Turner. Brackin acknowledged that she had contacted Turner. Brackin testified that, after Turner was placed on leave, she was assigned to take over Turner's job duties. Brackin explained that she had been unable to complete one of those duties without having access to a form for a letter that she was required to send to youthful offenders who had failed to appear in court. Brackin testified that she thought the form letter was on Turner's computer desktop, but, she said, all employees had been forbidden to go into Turner's office or to use Turner's computer, so Brackin telephoned Turner to inquire where she could find the form letter. On cross-examination, Brackin conceded that, after the judge's order, there were other occasions when she had conversations with Turner, but, she said, she did not recall the content of those conversations.
The second major offense with which Brackin was charged on April 29, 2005, was violating § 3-42(6) of the Personnel Rules  negligence in carrying out assigned duties by failing to account for a traffic ticket issued by a Dothan police officer. That charge arose out of the same nucleus of operative facts for which Turner had been placed on leave.
The evidence was undisputed that, on November 24, 2002, Cpl. Eric Duhaime issued a speeding ticket to Stephen Phelps. Cpl. Duhaime testified that, on December 4, 2002, he turned in that ticket and others he had recently issued, along with a UTTC transmittal form, to Brackin. Cpl. Duhaime acknowledged the tickets under oath before Brackin and left the magistrates' office. Later, Cpl. Duhaime said, *682 Turner contacted him, told him that she knew Stephen Phelps, and asked if Cpl. Duhaime would be willing to "void [the ticket] out." Duhaime agreed to void the ticket and asked Turner to return the copies of the ticket to him. Turner mailed all copies of the ticket to Cpl. Duhaime.
The record contains a UTTC transmittal form, dated December 4, 2002, and signed by Brackin. On the form, the space provided for the "court case number" with respect to the Phelps ticket is lined through and replaced with the word "VOID." Upon being shown the form, Brackin acknowledged that she had lined through the space for the court case number and had written the word "VOID," but, she said, she had no specific recollection of the Phelps ticket or why she wrote the word "VOID" on the form. In answer to a question by her attorney, she acknowledged that "[i]f the officer said that he gave the okay for the ticket to be retrieved, that [could have been] the basis for triggering [the] void." Brackin testified that, because the Phelps ticket was not with the UTTC transmittal form and the other tickets listed on the form, the Phelps ticket was "not in the system." She also stated that she was "not part of the process [that brought] the ticket out of the system." Brackin testified that she did not void the Phelps ticket; by writing the word "VOID" on the UTTC transmittal form, she merely reflected the reality that the ticket had already been voided.
Cpl. Duhaime testified that a police officer has unlimited discretion as to whether to issue a ticket to a motorist. He stated that sometimes, after an officer has issued a ticket, there is a valid reason to void the ticket. For example, Cpl. Duhaime said that if an officer writes a ticket for failure to have proof of insurance and, before the officer leaves the scene, the motorist finds his insurance card, the officer will void the ticket and write on the ticket the reason for voiding it. Cpl. Duhaime explained, however, that an officer has to account for all tickets, even those that have been voided. Cpl. Duhaime said that an officer is required to turn in all tickets to the magistrates' office and to provide a copy of a voided ticket to a superior officer.[2]
Judge Evans-Gordon testified that once a police officer has "sworn to" a ticket before a magistrate, the ticket becomes a "complaint" and neither the officer nor the magistrate can void the ticket. The ticket can be disposed of only by the court. The judge stated that, although the Dothan Municipal Court had no internal manual or memoranda that specifically addressed the instant situation, the magistrate's handbook "tells . . . how a UTTC is supposed to be handled." The record does not contain a copy of the magistrate's handbook. Cpl. Duhaime testified that, at the time he agreed to void the Phelps ticket, he was unaware that he did not have the discretion to void a ticket that had been "sworn to" before a magistrate. He stated that for his participation in voiding the Phelps ticket he was charged with a major offense and placed on two years' probation.

The Charge of Failing to Account for a Traffic Ticket
With respect to the charge that Brackin violated § 3-42(6) of the Personnel Rules by failing to account for a traffic ticket issued by a Dothan police officer, the circuit court's judgment reversing the Personnel Board's decision to uphold Brackin's dismissal states:

*683 "Evidence concerning the authority of a police officer to void traffic citations after they are issued seemed open to various interpretations at the time of and prior to Mary Beth Brackin's termination. Most witnesses seemed to agree that the issuing officer could void a citation for any reason prior to filing with the Magistrate's Office. Officer Duhaime apparently felt that he had this authority, as did Mrs. Brackin, at any time prior to its being assigned a city court case number and being transmitted to that Court. The City of Dothan, on the other hand, insists that once a citation is filed with the Magistrate's Office that it can only be disposed of by action of the City Judge.
"In the Court's opinion, the City's position is the more logical and sound policy for handling traffic citations. What is clear, however, is that no set policy was in place for Magistrates to follow in situations such as that presented to Mary Beth Brackin. What was she supposed to do when she began assigning case numbers for citations [listed on the UTTC transmittal form filed by Cpl. Duhaime] and discovered that Corporal Duhaime and Mary Turner had voided the citation to Stephen Phelps? Should she have insisted that Duhaime return the citation? Did she have that authority? Was it her responsibility to investigate what had happened and then `blow the whistle' on Mary Turner and Corporal Duhaime?
"Perhaps, in hindsight, a policy should be adopted whereby every citation voided after it is filed with the City Magistrate's Office should be flagged so that it can be investigated by the City Judge. Mary Beth Brackin didn't try to conceal anything. She had not voided the citation, nor had she sought permission to void it, nor did she know why it was voided. She simply marked the record to reflect the truth of the matter as she understood it, and for this she was charged with negligence. If she was negligent, there were others higher in the chain of custody of the Transmittal Sheet who were likewise negligent in not questioning why the citation was voided. The Transmittal Sheet is an official record and was on file with the City Court for almost eighteen (18) months prior to these charges being made.
"In the opinion of the Court, there was not substantial evidence of negligence on [Brackin's] part. Had a firm policy been established and made known to all Magistrates beforehand, then a departure from it could be deemed negligence. That didn't happen here."
In Lawrence v. State, 601 So.2d 194, 195 (Ala.Crim.App.1992)(quoting Brown v. State, 565 So.2d 585, 599 n. 16 (Ala.1990) (Maddox, J., dissenting)), the Court of Criminal Appeals explained the procedure established by statute and by rule for the issuance and handling of UTTC's:
"`To prevent the improper issuance of traffic tickets, and to prevent a law enforcement officer or other person from tearing up a ticket, there are strict accountability requirements in the statutes and in Rule 19[, Ala. R. Jud. Admin.,] for each and every Uniform Traffic Ticket and Complaint "issued to law enforcement officers." See § 12-12-54[, Ala. Code 1975,] and Rule 19(a)(5) [now Rule 19(A)(5)(a), Ala. R. Jud. Admin.].'"
Section 12-12-54, Ala.Code 1975, provides, in pertinent part:
"The judge or judges and the clerk of the district court shall designate personnel to be responsible for accounting for all uniform traffic tickets and complaints issued to law enforcement officers or others in their jurisdiction and for the proper disposition of the forms and shall *684 cause to be prepared records and reports relating to the uniform traffic tickets and complaints in the manner and at the time as may be prescribed by rule of the Supreme Court."
Section 12-12-56, Ala.Code 1975, provides:
"(a) No law enforcement officer or other officer or public employee shall dispose of a uniform traffic ticket and complaint or any portion thereof or the record of issuance thereof in a manner other than as required under rules or regulations promulgated pursuant to this subsection.
"(b) Any person who solicits or aids in the disposition or attempted disposition of a uniform traffic ticket and complaint or any portion thereof in any unauthorized manner is subject to the criminal contempt power of the district or municipal court."
Rule 19(A)(5), Ala. R. Jud. Admin., entitled "Accountability for Tickets," states:
"(a) Law Enforcement Agencies. Each law enforcement agency shall be responsible for the proper accounting and use of all tickets stocked by that agency. Each law enforcement officer issuing a ticket shall complete and sign the ticket, serve a copy of the completed ticket upon the defendant and, without unnecessary delay, normally within 48 hours, acknowledge under oath the facts alleged therein before any person within the judicial branch of government who is authorized by the State of Alabama to administer oaths and file the court copies of the ticket with the court having jurisdiction over the alleged offense.
"(b) Courts. The presiding circuit judge, other judge, or clerk of each court shall designate personnel to be responsible for accounting for all tickets used in such court. The designated personnel shall be responsible for the proper disposition and accounting of such tickets and shall cause to be prepared and submitted such records and reports relating to the tickets as may be requested by the [Administrative Director of Courts]."
Rule 43, Ala. R. Jud. Admin., entitled "Minimum Accounting Requirements for Municipal Courts," provides, in pertinent part:
"(A) Internal Controls Over Records and Cash. The magistrate or the municipal judge should design a system of internal control over all court records. Those controls should address [UTTC] numbers and procedures for accounting for all UTTC numbers. They should also address assignment of case numbers and accounting for all cases and their disposition. The procedures should set out responsibilities of court personnel and segregate duties to the extent possible with the number of employees assigned. The procedures for the internal-control system should be set out in writing.
". . . .
"(B) Uniform Traffic Ticket and Complaint Forms. . . .
". . . .
"When an officer transmits to the court UTTC forms that have been issued, he or she should list each ticket in numerical sequence on a UTC Transmittal Form (Form UTC-3, attached to this rule as Appendix C), arrange the tickets . . . in the order that they appear on the Form UTC-3 and submit both copies of this form to the court clerk.
"The court clerk should assign a case number to each citation issued on the Form UTC-3, write the case number in the appropriate space on the form, and return the copy to the officer for his or her records.

*685 "NOTE: The UTTC Transmittal Forms should then be placed in a permanent record book (a three-ring binder is ideal for this purpose if the holes are punched in the transmittal). The forms should be filed in case number sequence. The permanent record of UTTC forms received, issued to officers, and received after issuance by the officers, and the permanent record book of UTTC Transmittal Forms should be kept in a secure place."
The circuit court's judgment states that "[e]vidence concerning the authority of a police officer to void traffic citations after they are issued seemed open to various interpretations at the time of and prior to Mary Beth Brackin's termination." Although that statement may be true, it is irrelevant to the issue presented. A police officer's authority to void a ticket after it has been "sworn to" is not the issue in this case. The issue is what a police officer (and, subsequently what a magistrate like Brackin) must do with all tickets, whether they have been "voided" or not. The facts and the law pertaining to that issue are clear. Cpl. Duhaime testified that a police officer has to account for all tickets, even those that have been voided. Cpl. Duhaime said that an officer is required to turn in all tickets to the magistrates' office and to provide a copy of a voided ticket to a superior officer. The "Instruction to Officers" section of the UTTC itself states that "[a]ll copies of a voided ticket must be returned to the local issuing office." By asking Turner to mail the copies of the Phelps ticket to him, Cpl. Duhaime violated § 12-12-56(a), Ala.Code 1975, which provides:
"(a) No law enforcement officer or other officer or public employee shall dispose of a uniform traffic ticket and complaint or any portion thereof or the record of issuance thereof in a manner other than as required under rules or regulations promulgated pursuant to this subsection."
The evidence was undisputed that, on December 4, 2002, Brackin placed Cpl. Duhaime under oath, Cpl. Duhaime acknowledged the facts underlying the issuance of the Phelps traffic ticket, and Cpl. Duhaime turned in that ticket, along with a UTTC transmittal form listing that ticket, to Brackin. Pursuant to § 12-12-54, Ala. Code 1975, Brackin was thereafter "responsible for accounting for [the Phelps ticket] . . . and for the proper disposition of the [transmittal form]." Pursuant to Rule 43(B), Ala. R. Jud. Admin., Brackin was required to "assign a case number to [the Phelps] citation . . . on the [Transmittal] Form . . ., write the case number in the appropriate space on the form, and return the copy to [Cpl. Duhaime] for his . . . records." She did none of those things. The circuit court asked the following questions:
"What was [Brackin] supposed to do when she began assigning case numbers for citations [listed on the UTTC transmittal form filed by Cpl. Duhaime] and discovered that Corporal Duhaime and Mary Turner had voided the citation to Stephen Phelps? Should [Brackin] have insisted that Duhaime return the citation? Did she have that authority? Was it her responsibility to investigate what had happened and then `blow the whistle' on Mary Turner and Corporal Duhaime?"
The circuit court's first question is based upon an assumption not supported by the evidence. The record contains no evidence indicating that Brackin "discovered that Corporal Duhaime and Mary Turner had voided the citation to Stephen Phelps." The evidence indicated only that Brackin discovered that the Phelps citation, which Cpl. Duhaime had listed on the UTTC *686 transmittal form, was missing. Thus, if the circuit court's first question is rephrased to inquire, "What was Brackin supposed to do when she began assigning case numbers for the citations listed on the UTTC transmittal form filed by Cpl. Duhaime and discovered that the Phelps citation was missing," the answer is: When Brackin began assigning case numbers for all the traffic citations on the UTTC transmittal form filed by Cpl. Duhaime and she noticed that the Phelps citation was missing, she should have, pursuant to § 12-12-54 and Rule 43(B), Ala. R. Jud. Admin., assigned a case number for the Phelps citation and allowed the matter to proceed to municipal court where, no doubt, the municipal judge could have sorted out questions of authority, blame, whistle-blowing and investigation. As the facts of this case and the applicable law demonstrate, the circuit court erred by concluding that the law pertaining to the disposition of voided traffic tickets is ambiguous. The court also erred in determining that the Dothan Municipal Court had no "firm policy [regarding the disposition of UTTCs] . . . made known to all [municipal court] magistrates," and, thus, that there was not substantial evidence of Brackin's negligence. On the contrary, a firm policy is set out in the applicable statutes and court rules regarding the handling and disposition of UTTCs.
We hold that the Personnel Board had before it substantial evidence indicating that Brackin was negligent in failing to account for a traffic ticket issued by a Dothan police officer. The circuit court erred in concluding otherwise.

The Charge of Insubordination
With respect to the charge that Brackin violated § 3-42(14) of the Personnel Rules by being insubordinate to her supervisor, the circuit court's judgment reversing the Personnel Board's decision to uphold Brackin's dismissal states:
"As to the charge of insubordination, [Brackin] did not violate the spirit of the City Judge's Order; that is, she didn't contact Mary Turner in an effort to compromise the City's investigation of Ms. Turner in any way. To say that what [Brackin] did was insubordinate stretches the meaning and intent of that term considerably."
In Maddox v. Clark, 422 So.2d 791, 794 (Ala.Civ.App.1982), this court stated:
"`"Insubordination" has been defined by our Courts as the wilful refusal of an employee to obey an order of a superior officer so long as that order is reasonably related to the duties of the employee. Heath v. Alabama State Tenure Commission, 401 So.2d 68 (Ala.Civ.App. 1981); Howell v. Alabama State Tenure Commission, 402 So.2d 1041 (Ala.Civ. App.1981).'"
(Quoting the trial court's judgment). See also Fuqua v. City Council of Ozark, 567 So.2d 354, 357 (Ala.Civ.App.1990) (quoting Heath v. Alabama State Tenure Comm'n, 401 So.2d 68, 70 (Ala.Civ.App.1981)) (stating that "[i]nsubordination has been defined `as the refusal to obey some order which a superior officer is entitled to give and entitled to have obeyed so long as such order is reasonably related to the duties of the employee'").
In City of Mobile v. Mills, 500 So.2d 20, 22 (Ala.Civ.App.1986), Cpl. Milton Mills of the Mobile police department was dismissed from his employment. He was charged, among other things, with insubordination arising out of his disobedience of a rule restricting him from entering the female housing areas of the city jail alone. When the jail warden confronted Cpl. Mills regarding his violation of the rule, Cpl. Mills responded "that he [Mills] did not have to listen to anyone; that he set his *687 own rules." 500 So.2d at 22. This court determined that the Mobile Personnel Board had before it substantial evidence supporting Cpl. Mills's dismissal.
We conclude that the circuit court erred when it decided that Brackin did not violate the spirit of the municipal judge's order not to contact Turner. Although Brackin presented evidence indicating that one of her contacts with Turner was prompted by a job-related necessity, she conceded that she had not sought Judge Evans-Gordon's permission before making the job-related telephone call. From that evidence, the Personnel Board could have concluded that Brackin was, in effect, "set[ting] [her] own rules." City of Mobile v. Mills, 500 So.2d at 22. Moreover, Brackin also acknowledged that she had other conversations with Turner after the judge issued the no-contact order, but, she said, she did not recall the content of those conversations. In light of the fact that Brackin had specifically inquired whether the judge's order applied to after-hours contact with Turner and the judge had replied that the order applied to "all contact," the Personnel Board was authorized to conclude that Brackin willfully disregarded the judge's directive.
Brackin cites Wilson v. Taylor, 733 F.2d 1539 (11th Cir.1984), and Milligan v. Albertville City Board of Education, 628 So.2d 625 (Ala.Civ.App.1993), in support of the argument she made to the Personnel Board that the judge's order violated her First Amendment right to freely associate with Turner during her after-hours time. We find Wilson and Milligan distinguishable.
In Wilson, a city police officer was fired for dating the daughter of a convicted felon and reputed member of organized crime. The officer appealed his dismissal, asserting that the city had infringed upon his right to freedom of association. The city took the position that dating was not the type of association protected by the First Amendment, asserting that only those associations aimed at the advancement of beliefs and ideals were intended to be constitutionally protected.
The United States Court of Appeals for the Eleventh Circuit determined that the First Amendment freedom of association extends even to purely social and personal associations such as dating; therefore, it held, the officer was fired for a reason infringing on a constitutionally protected right. In so holding, the court cautioned: "This is a narrow holding. We do not hold that a law enforcement officer may never be fired because of associations with others." 733 F.2d at 1544 n. 3 (emphasis added). The court then cited decisions upholding an employer's right to curtail certain personal associations because of "`the exigencies of . . . discipline'" or the interest in "`instill[ing] public confidence in the law enforcement institution.'" Id.
In Milligan, a probationary teacher's aide sued a city board of education, alleging that she had been dismissed from her employment in violation of her First Amendment right to freedom of association. In opposition to the board's motion for a summary judgment, the teacher's aide submitted an affidavit from one of the school board members. The affidavit averred that the aide had been placed on a list of persons to be dismissed as a "bargaining chip" in order to force the school board member, who had a close personal association with the aide and her family, to vote a certain way. When the school board member declined to vote as requested, the aide was dismissed. The circuit court entered a summary judgment for the board, and the aide appealed. On appeal, the board asserted that the aide had failed to present any evidence indicating that she had been dismissed because of her exercise *688 of rights protected under the First Amendment; instead, it said, her dismissal was the lawful dismissal of an "at will" employee.
This court reversed, holding that there was a genuine issue of material fact regarding whether the aide had been dismissed in violation of a constitutionally protected right. As guidance for the trial court on remand, this court stated that the aide would have the burden of establishing that her conduct was constitutionally protected and that her constitutionally protected conduct was a substantial or motivating factor in the adverse employment decision. 628 So.2d at 629. If she met that burden, the board would then be required to show by a preponderance of the evidence that it would have reached the same employment decision in the absence of the protected conduct. Id.
Wilson and Milligan should be read as decisions disapproving adverse actions against employees based solely upon the existence of the employees' social and personal associations. In the present case, Brackin was not dismissed because of the existence of a personal or social relationship with Turner, but because she disobeyed her supervisor's directive to curtail, for a limited time, acting on that relationship. The judge's order prohibiting contact with Turner was a reasonable and limited restriction on Brackin's right to freedom of association that, by its terms, was to last only for the duration of a police investigation into illegal conduct in the magistrates' office. Clearly, the judge's order was one "`which a superior officer [was] entitled to give and entitled to have obeyed,'" see Heath v. Alabama State Tenure Comm'n, 401 So.2d at 70, because it was "`reasonably related to the duties of the employee,'" id. City magistrates have a duty to adhere to the "`strict accountability requirements in the statutes and in Rule 19[, Ala. R. Jud. Admin.,]'" regarding "`each and every [UTTC] "issued to law enforcement officers."'" Lawrence v. State, 601 So.2d at 195. Judge Evans-Gordon could reasonably have decided that, under the circumstances, that duty encompassed the obligation to avoid the appearance of impropriety that might arise if one city magistrate were to converse with another city magistrate during an investigation of the second magistrate for flouting the accountability requirements.
The Personnel Board was authorized to conclude that the directive prohibiting even after-hours contact with Turner was warranted by the judge's understandable concern that any fraternization with Turner by another magistrate who continued to work in, and have access to computer records of, a public agency in which a "ticket-fixing" incident had allegedly occurred, could compromise or call into question the integrity of the police investigation into the illegal conduct. We hold that the circuit court erred in determining that the Personnel Board was not presented with substantial evidence indicating that Brackin was insubordinate by conversing with Turner in violation of Judge Evans-Gordon's order.

The Probation Violation
The Personnel Rules outline a system of progressive employee discipline. For a "minor offense," the first step is formal counseling, which involves a conversation between a supervisor and an employee about a performance issue. The next step is a written warning, followed by a final warning, or a final warning and a one- to five-day suspension without pay, after which discharge may occur.
The disciplinary action that follows the commission of a "major offense" is a final warning and a 1- to 20-day suspension without pay. The employee who commits a "major offense" is, in effect, put on a *689 two-year probationary period. Section 3-20(2)(b) of the Personnel Rules provides:
"The disciplinary progression period for `Major' category offenses shall be twenty-four consecutive months from the date of the last `Major' category offense violation. In order for an employee to clear his record of `Major' category offenses, the employee must not commit any major category disciplinary offenses during the twenty-four month progression period."
The commission of any other "major offense" within 24 months after having been disciplined for a previous "major offense" is a ground for discharge. Section 3-30(4) of the Personnel Rules provides, in pertinent part:
"Final Warning and One to Twenty Days Suspension Without Pay. This is the disciplinary action that follows violation of any offense classified as `Major.' A due process hearing (Determination Hearing) is conducted with the employee prior to making a decision to implement this disciplinary action (Personnel Regulation IV). The supervisor will meet in a formal discussion with the employee explaining the exact offense(s) the employee violated and the seriousness and consequences of the offense(s). The supervisor shall instruct the employee how he/she may correct his/her performance and/or behavioral problem. The supervisor shall explain to the employee that the violation of any further `Major Offense' within two years from the date of record of this offense is grounds for discharge."
Section 3-30(5), entitled "Discharge," provides:
"Discharge is the most severe disciplinary action that may be taken against an employee. A due process hearing (Determination Hearing) must be conducted with an employee prior to making a decision to discharge an employee (Personnel Regulation IV). An employee who does not correct performance and/or behavioral problems after the progressive discipline process for `Minor' and/or `Major Offenses' or an employee who commits an `Intolerable Offense' is indicating an inability or unwillingness to correct his/her behavior. By utilizing progressive discipline, it is hoped that many employee problems can be corrected at an early stage, thereby benefitting both employees and the City by eliminating an employee's discharge from his/her position with the City of Dothan."
At the Personnel Board hearing, Brackin argued that the conduct made the basis of the § 3-42(6) charge against her  that she was negligent in failing to account for the Phelps ticket  occurred on December 4, 2002, but that the Personnel Board erroneously treated the conduct, for purposes of the two-year major-offense probationary period, as having occurred on April 29, 2005  the date Judge Evans-Gordon discovered the conduct and signed the City of Dothan Employee Disciplinary Action Report Form ("the disciplinary form"). Brackin maintained that, because she did not commit the alleged offense within two years after April 22, 2004, when she was disciplined for a prior major offense, the alleged offense could not have been used as a ground for her dismissal. The City argues that the date of the second offense was, as a matter of law, April 29, 2005, and not December 4, 2002. It bases that argument on the fact that Brackin signed a disciplinary form containing the following notation:
"The offense[-]free time period required to clear a disciplinary record of . . . MAJOR offenses is 24 months from the `date of record' for last offense committed. *690 (`Date of Record' is date form signed by department head)."
For three reasons, we hold that the Personnel Board erred as a matter of law in determining that the "date of record" for Brackin's most recent major offense was April 29, 2005, rather than December 4, 2002. First, the actual wording of the notation on the disciplinary form does not support the City's interpretation. The notation establishes the "date of record" only for an employee's last (or prior) major offense (which, in this case, was April 22, 2004, the date Brackin was suspended for giving a citizen information about filing a claim for false arrest). Neither the notation nor the Personnel Rules purports to establish the "date of record" for a subsequent major offense, the offense that triggers the discharge option outlined in § 3-30(5) of the Personnel Rules. See Personnel Rules, § 3-20(2)(b):
"The disciplinary progression period for `Major' category offenses shall be twenty-four consecutive months from the date of the last `Major' category offense violation. In order for an employee to clear his record of `Major' category offenses, the employee must not commit any major category disciplinary offenses during the twenty-four month progression period."
(Emphasis added.)
Second, the City's interpretation is at odds with the purposes of its progressive discipline policy. That policy is based on the assumption that an employee who has engaged in unacceptable behavior will be counseled, given a fair opportunity to modify his or her behavior, and warned that another infraction may lead to discharge. See generally William J. Sonnenstuhl et al., Employee Assistance and Drug Testing: Fairness and Injustice in the Workplace, 11 Nova L.Rev. 709, 716 (Winter 1987) (stating that "[t]he purposes of progressive discipline . . . are to give employees feedback on their behavior, to discover and correct the underlying causes of poor performance, and to induce employees, by progressive sanctions, to conform to standards in the future"). The City's Personnel Rules are based on the concept that
"[b]y utilizing progressive discipline, it is hoped that many employee problems can be corrected at an early stage, thereby benefitting both employees and the City by eliminating an employee's discharge from his/her position with the City of Dothan."
Personnel Rules, § 3-30(5)(emphasis added). Section 3-30(4) of the Personnel Rules provides, in pertinent part:
"The supervisor will meet in a formal discussion with the employee explaining the exact offense(s) the employee violated and the seriousness and consequences of the offense(s). The supervisor shall instruct the employee how he/she may correct his/her performance and/or behavioral problem. The supervisor shall explain to the employee that the violation of any further `Major Offense' within two years from the date of record of this offense is grounds for discharge."
(Emphasis added.) By treating conduct that allegedly occurred in 2002 as having occurred in 2005, the City thwarted two of the purposes for the progressive discipline policy: giving the offending employee the opportunity to modify or correct her behavior after counseling; and warning the offending employee that a future infraction could lead to dismissal.
Third, the City's progressive discipline policy is sufficiently analogous to the recidivist provisions of our Criminal Code that decisions interpreting the Alabama Habitual Felony Offender Act are persuasive. Section 13A-5-9, Ala.Code 1975, provides that "[i]n all cases when it is shown that a *691 criminal defendant has been previously convicted of a felony and after the conviction has committed another felony," the criminal defendant must be sentenced to an enhanced penalty as a repeat offender. The Court of Criminal Appeals has consistently held that "the recidivist statute comes into play only when a defendant commits an offense after he has previously been convicted of a felony." Burgess v. State, 412 So.2d 298, 299 (Ala.Crim.App. 1982)(first emphasis in original; second emphasis added). See also Bridges v. State, 563 So.2d 13 (Ala.Crim.App.1989); and Hamm v. State, 439 So.2d 829 (Ala. Crim.App.1983). Similarly, the discharge option outlined in § 3-30(5) of the City's Personnel Rules comes into play only when an employee commits a major offense within 24 months after she has been disciplined for a previous major offense.

Conclusion
Under the Personnel Rules, an employee who commits a major offense within 24 months after having been disciplined for a previous major offense is subject to dismissal. See § 3-30(4) and § 3-30(5), Personnel Rules. As we have explained, Brackin's December 4, 2002, offense cannot be considered as a second major offense committed within 24 months after having been disciplined for a previous major offense on April 22, 2004. The Personnel Board's August 19, 2005, order does not state whether it determined that Brackin committed either or both of the major offenses of insubordination and negligence in carrying out assigned duties. The order merely states that the Personnel Board "affirms the department head's decision to terminate [Brackin's] employment."
Accordingly, we reverse the judgment of the Houston Circuit Court and remand the cause with instructions to that court to remand the cause to the Personnel Board with instructions to answer the following questions: (1) Did the Personnel Board determine that Brackin committed the major offense of insubordination within 24 months after having been disciplined for a previous major offense on April 22, 2004? and (2) If so, was that offense sufficient to warrant Brackin's dismissal?
REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in part in the rationale and concurs in the result, with writing.
BRYAN, J., concurs in the result, with writing.
MURDOCK, Judge, concurring in part in the rationale and concurring in the result.
I concur in that portion of the main opinion explaining that the conduct made the basis of the "§ 3-42(6) charge" against Brackin  that she was "negligent" in failing to account for the Phelps ticket  did not occur within 24 months after Brackin was disciplined for a previous major offense and therefore could not provide the basis for the Personnel Board's decision to uphold the termination of Brackin's employment. Because of this conclusion, however, that portion of the main opinion titled "The Charge of Failing to Account for a Traffic Ticket" is dictum. Because I would not reach the issue addressed in that part of the main opinion, I only concur in the result reached by the main opinion.
The Personnel Board's decision in this case does not reveal whether it found Brackin guilty of both the negligence and the insubordination offenses with which she was charged. Accordingly, we do not know which of these two alleged offenses constituted the "subsequent major offense" *692 upon which Brackin's dismissal was upheld, or whether it was upheld based on both of these alleged offenses. Since, as noted above, the negligence charge is not available as a basis for dismissal, on remand it will fall to the Personnel Board to assess the evidence and determine whether Brackin engaged in communications with Turner that constituted the major offense of insubordination. If it makes an affirmative determination in this regard, the Personnel Board must then make a determination as to whether Brackin's dismissal should be upheld on this basis, or whether some lesser discipline should be imposed.
BRYAN, Judge, concurring in the result.
I concur in the result because I am convinced that Judge Murdock is correct in concluding that "that portion of the main opinion titled `The Charge of Failing to Account for a Traffic Ticket' is dictum." 959 So.2d at 682-83 (Murdock, J., concurring in part in the rationale and concurring in the result).
The main opinion's treatment of the First Amendment is based upon the premise that Brackin was punished for contact with Turner that did not involve attendance at church. The main opinion should not be interpreted as sanctioning the municipal judge's prohibition of Brackin's attending the same church as Turner. That prohibition violated Brackin's right to attend the church of her choice, which is protected by the First Amendment.
NOTES
[1] The investigation ultimately revealed that Turner had promised to fix Phelps's speeding ticket in return for Phelps's doing work on Turner's roof.
[2] The UTTC is reproduced as Attachment One to Rule 19, Ala. R. Jud. Admin. The UTTC contains a page of "Instructions to Officers" that includes the following statement:

"5. All copies of a voided ticket must be returned to the local issuing office."