[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10102
Non-Argument Calendar
_____

D.C. Docket No. 2:10-cv-00099-WCO

E. DARRELL MOORE, et al.,

Plaintiffs-Appellants,

versus

MELVIN TOLBERT, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 18, 2012)

Before HULL, JORDAN and FAY, Circuit Judges.

PER CURIAM:

Felicia Scroggs, E. Darrell Moore, and I-85 Garage and Towing, Inc. sued Robert

Russell III, Mark Abruzzino, Rebecca Davis, and the City of Pendergrass, alleging

that the defendants fired them from their government jobs because of their friendship with a group of whistleblowers. The defendants' actions, the plaintiffs alleged, violated their First Amendment right to intimate association. The defendants also allegedly acted in concert in such a way as to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. The defendants moved for summary judgment, and the district court granted their motion. The plaintiffs now appeal, and, after reviewing the record, the briefs, and the parties' arguments, we affirm.

I

The facts, viewed in the light most favorable to the plaintiffs, are as follows.

Pendergrass, Georgia, is a small town about 60 miles northeast of Atlanta. E. Darrell Moore, owner and president of I-85 Garage and Towing, Inc., lived in Pendergrass, as did his daughter, Felicia Scroggs.

In 2002, I-85 Garage became the exclusive towing company for the Pendergrass Police Department, although its work was always on an on-call, as-needed basis. Mr. Moore, as president of I-85 Garage, of course helped in the towing operations. Mrs. Scroggs, for her part, worked for Pendergrass as a librarian and deputy court clerk.

In 2009, three Pendergrass residents would ignore the advice of Niccolo Machiavelli that "[t]here is nothing more difficult to take in hand, more perilous to conduct, or more uncertain in its success, than to take the lead in the introduction of

a new order of things." NICCOLÒ MACHIAVELLI, THE PRINCE 28 (W.K. Marriot tr., Veroglyphic Publishing 2009) (1532). Katherine Rintoul, William Garner, and Scott Rogers became "whistleblowers" against the perceived Pendergrass status quo. They raised a ruckus about Pendergrass' city officials, in particular Melvin Tolbert (the mayor) and Robert Russell, III (the city administrator and chief of police).

Mr. Moore was a friend of Mr. Russell, and, as noted, his company was the Pendergrass Police Department's exclusive towing contractor. Mr. Moore, however, knew Mr. Garner as well. Mr. Moore and Mr. Garner sometimes ate meals, watched television, worked on cars, and went shooting together. Like her father, Mrs. Scroggs knew Mr. Garner. Mr. Garner's wife would sometimes babysit Mrs. Scroggs' child, and Mrs. Scroggs would bring Mr. Garner his paycheck. In addition, Mrs. Scroggs had a friendship with Ms. Rintoul. They worked closely at City Hall, and Ms. Rintoul was a wedding attendant at Mrs. Scroggs' wedding. Mrs. Scroggs thus considered Mr. Garner and Ms. Rintoul—two of the three whistleblowers—personal friends.

Mr. Moore and Mrs. Scroggs became embroiled in the political upheaval. In August of 2009, Mr. Russell told Mr. Moore to end his friendship with Mr. Garner. Mr. Moore said that he obeyed Mr. Russell's directive. By October 16, 2009, the controversy had intensified, and the Jackson County Superior Court held a hearing on whether to recall Pendergrass' elected officials. By now two factions had emerged.

3

A local newspaper editor and Mr. Garner commanded one faction, while Mr. Russell and Mr. Tolbert led the other faction. Mr. Moore attended the recall hearing because Mrs. Scroggs had somehow been served with the recall petition. At the hearing, Mr. Moore sat near Mr. Garner and the newspaper editor, and he spoke with both of them. Mr. Moore had no political motive for sitting near Mr. Garner.

After the recall hearing, Rebecca Davis—a Pendergrass police and probation officer—called the 9-1-1 dispatch center and asked that I-85 Garage be taken off the towing list. Upon learning that I-85 Garage would no longer tow cars for the Pendergrass Police Department, Mr. Moore became part sleuth. He recorded conversations with Ms. Davis, Mr. Russell, and Mark Abruzzino (a Pendergrass police officer). In these recordings, Ms. Davis, Mr. Russell, and Mr. Abruzzino made one thing clear: they were upset with Mr. Moore because of his friendship with Mr. Garner. And Mr. Moore's appearance of support for Mr. Garner and the whistleblower faction at the recall hearing similarly enraged Ms. Davis, Mr. Russell, and Mr. Abruzzino, who confessed in the recorded conversations that they (and Mr. Tolbert) removed I-85 Garage as the exclusive towing company for the Pendergrass Police Department because of Mr. Moore's friendship with Mr. Garner. Eventually, Pendergrass fired Mrs. Scroggs too, apparently because of her friendship with Mr. Garner and Ms. Rintoul.

Mrs. Scroggs and Mr. Moore, along with I-85 Garage, sued Pendergrass, Mr.

Abruzzino, Ms. Davis, Mr. Russell, and Mr. Tolbert, alleging that they violated Mrs. Scroggs' and Mr. Moore's First Amendment right to intimate association and that they violated the Racketeer Influenced and Corrupt Organization Act, commonly known as the RICO Act.

After the parties took depositions and gathered all relevant evidence, the defendants moved for summary judgment. The district court granted the defendants' motion, and Mr. Moore, Mrs. Scroggs, and I-85 Garage appealed.

## II

We exercise plenary review in reviewing a summary judgment order. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). A court must grant a summary judgment motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997).

## III

### A

The United States Constitution, through the First Amendment, protects two forms

5

of association: intimate association and expressive association. *See McCabe v. Sharrett*, 12 F.3d 1558, 1562–63 (11th Cir. 1994). The right to intimate association is "the freedom to choose to enter into and maintain certain intimate human relationships," whereas the right to expressive association is "the freedom to associate for the purpose of engaging in activities protected by the First Amendment, such as speech, assembly, petition for the redress of grievances, and the exercise of religion." *Id.* at 1563.

When it acts as an employer, the government may not condition employment upon requirements that violate constitutional rights, which would include the constitutional rights to intimate and expressive association. *See Terry v. Cook*, 866 F.2d 373, 375 (11th Cir. 1989). If the government conditions employment on requirements that violate constitutional rights, the employee may sue the government. *See generally* 42 U.S.C. § 1983.

Mr. Moore and Mrs. Scroggs contend that the defendants violated their right to intimate association, but they are wrong. To be sure, we have recognized that a dating relationship of about four years constitutes an intimate relationship for which an employee may not be fired. *See Wilson v. Taylor*, 733 F.2d 1539, 1544 (11th Cir. 1984), *abrogated on other grounds as recognized in Scala v. City of Winter Park*, 116 F.3d

6

1396, 1402 n.4 (11th Cir. 1997).[1] But the Supreme Court has said that the bonds that merit constitutional protection are "those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (citations omitted). "Whether the right extends to other relationships depends on the extent to which those attachments share the qualities distinctive to family relationships . . . ." *McCabe*, 12 F.3d at 1563.

Mr. Moore and Mrs. Scroggs have failed to show that they had a constitutionally protected intimate association with Mr. Garner. In an affidavit, Mr. Moore said that he knew Mr. Garner, that they sometimes ate meals together, watched television together, worked on cars together, and shot guns together. R. 1:42-5 at 3. Mrs. Scroggs, meanwhile, said that Mr. Garner's wife would sometimes babysit her child. She also stated that she picked up Mr. Garner's paycheck for him. R. 1:46-7 at 2–3. These facts simply are not enough to place Mr. Moore's and Mrs. Scroggs' relationships with Mr. Garner within the boundaries of marriage or childbirth. And they do not share those qualities that are distinctive to family relationships.

True, families share meals, sometimes watch television together, might work

---

[1] We have noted that *Wilson* has "a narrow holding." *Chesser v. Sparks*, 248 F.3d 1117, 1125 n.10 (11th Cir. 2001).

7

on cars together, and might go shooting together, but these traits are not inherent to family relationships. Mr. Moore and Mrs. Scroggs offer no further factual details about their relationship with Mr. Garner. On this record, we cannot conclude that their relationship (an apparently generic friendship) contained qualities distinctive to family relationships. We therefore cannot conclude that their relationship with Mr. Garner merits constitutional protection. *See Vieira v. Presley*, 988 F.2d 850, 853 (8th Cir. 1993) ("The second amended complaint does not allege a close, intimate relationship of the type recognized as protected in *Roberts*. It merely characterizes Vieira's associates as friends . . . ."); *Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1551 (10th Cir. 1989) ("[I]t cannot be denied that plaintiff was transferred at least partly because of his [friendship] with Blackburn. We do not believe, however, that plaintiff's relationship with Blackburn is the type of association that the First Amendment shelters from governmental action . . . ."); *Rode v. Dellarciprete*, 845 F.2d 1195, 1205 (3d Cir. 1988) ("Nor would her assertion that she and Hileman were 'good friends' appear sufficient to invoke protection where their relationship was not based on the 'creation and sustenance of a family.'"); *Correa v. Arrillaga*, 903 F.2d 49, 57 (1st Cir. 1990) ("Entry into the constitutional orbit requires more than a mere relationship."), *overruled on other grounds by Educadores Puertorriqueños en Accion v. Hernández*, 367 F.3d 61 (1st Cir. 2004).

Similarly, Mrs. Scroggs had no constitutional right to intimately associate with Ms. Rintoul. In an affidavit, Mrs. Scroggs mentioned that she worked closely with Ms. Rintoul and that Ms. Rintoul was an attendant at her wedding. R. 1:46-7 at 2–3. But a co-worker—even a wedding attendant—falls short of the relationship one creates with marriage or childbirth. *See Cummings v. DeKalb Cnty.*, 24 F.3d 1349, 1354 (11th Cir. 1994) (co-worker relationship not enough). And Mrs. Scroggs offers no facts that suggest her relationship with Ms. Rintoul "resembles a family relationship." *McCabe*, 12 F.3d at 1563. Indeed, nothing in the record indicates that Ms. Rintoul's friendship with Mrs. Scroggs was unusually intimate, and so the defendants did not violate Mrs. Scroggs' right to intimate association here.

I-85 Garage also brought a claim for the violation of its right to intimate association. But I-85 Garage is a corporation, "not a biological entity." *Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298, 1311 (11th Cir. 2012). Corporations do not have "friends" or "family members" in any coherent sense. It is unclear, then, how corporations can have intimate associations at all. I-85 Garage offers no explanation. Instead, it rests its claim vicariously on Mr. Moore's and Mrs. Scroggs' claims. But, as explained above, those claims fail, and so too does I-85 Garage's claim.

B

9

On appeal, the plaintiffs also argue that the defendants' actions conditioned their public employment on political association—i.e., on siding with the defendants' faction over the whistleblowers' faction. *See Beauregard v. Olson*, 84 F.3d 1402, 1403 (11th Cir. 1996) ("Some employees do have a general First Amendment right not to be fired for political patronage reasons."). As the district court recognized, "there are some facts in the record that seem to carry potential political overtones that would possibly be protected under the right of expressive association." R. 2:67 at 26 n.6.

But the plaintiffs never raised a political-association argument in the district court. *See* Resp. in Opp'n to Mot. for Summ. J., R. 1:42-1 at 5 ("The Defendants infringed upon the plaintiffs right to freely associate with others in a purely social or personal level."); Resp. in Opp'n to Mot. for Summ. J., R. 1:42-1 at 11 ("I-85 and Mr. Moore's personal relationships outweighed the City of Pendergrass' interest in this matter."); Order on Summ. J. Mot., R. 2:67 at 26 n.6 ("[Mr. Moore] never claims that the removal from the towing list was premised on political reasons or his lack of political support for Tolbert or anyone else. Instead, he couches his claims purely in terms of his friendship with Garner."). And we do not consider arguments not raised in the district court. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Thus, Mr. Moore, Mrs. Scroggs, and I-85 Garage cannot assert their political-association argument on appeal.

10

C

Finally, the plaintiffs claim that Mr. Abruzzino, Ms. Davis, Mr. Russell, and Mr. Tolbert are "persons" under the RICO Act, and that Pendergrass is an "enterprise" under the RICO Act. The plaintiffs also argue that, together, the defendants have committed at least two predicate acts. We disagree.

"[I]n order to establish a federal civil RICO violation under [18 U.S.C.] § 1962(c)," a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1282 (11th Cir. 2006) (per curiam). In a civil RICO action, like the one here, the plaintiff must further prove an injury to "business or property" and prove that such injury was "by reason of" a violation of the RICO statute. *See* 18 U.S.C. § 1964(c). The plaintiffs have shown neither that the defendants were engaged in racketeering activity nor that the defendants' purported RICO violation injured their business or property.

The RICO Act defines "racketeering activity" as three broad categories of crimes defined in 18 U.S.C. § 1961(1). "A pattern of racketeering activity consists of the commission of at least two distinct but related predicate acts." *Ironworkers Local Union 68 v. AstraZeneca Pharms.*, 634 F.3d 1352, 1358 n.13 (11th Cir. 2011). The plaintiffs assert the following predicate acts: (1) bribery; (2) extortion; (3) influencing of witness; and (4) retaliation against a witness, victim, or informant. In particular, the plaintiffs

list the following predicate acts:

- The defendants "sought to change" Mr. Moore's "recollection of shredded documents by threatening the arrest of his daughter and the implication of his own arrest." Br. of Appellants at 30.

- Mr. Russell "demanded" that Mr. Moore "leave the Jackson County Courthouse on October 16, 2009, to prevent him from testifying" at the recall hearing. Br. of Appellants at 31.

- Mr. Russell and Mr. Abruzzino "used intimidation and promises of economic gain in attempts to influence Mr. Moore's testimony." The defendants "used threats of arrest of" Mrs. Scroggs "to intimidate" Mr. Moore. Br. of Appellants at 31.

- Mr. Russell and Mr. Abruzzino "threatened the arrest of" Mrs. Scroggs, but they "stated they would not prosecute her if Mr. Moore cooperated with them." Br. of Appellants at 33.

- Mr. Russell and Mr. Abruzzino "stated they would not proceed in the investigation" of Mrs. Scroggs if Mr. Moore "would get on the 'right side' and be a member of the 'family' of Pendergrass." Br. of Appellants at 33.

We conclude, however, that the defendants did not undergo a pattern of racketeering activity.

We agree with the district court that the record does not support the plaintiffs' characterization of the recorded conversations as threats. Plus, there is nothing on the record to suggest that Mr. Moore would have spoken at the recall hearing. To the contrary, Mr. Moore testified that he did not want to get "involved in politics." R. 3:56 at 65. When Mr. Russell asked whether he would have testified at the recall hearing, Mr. Moore replied that he wouldn't have, because he did not want to "be in the middle

of it." R. 2:42-18 at 17–18. Simply put, the record does not support the plaintiffs' assertion that the defendants engaged in racketeering activity, and so Mr. Moore's, Mrs. Scroggs', and I-85 Garage's federal RICO claim fails.

Regardless, the plaintiffs do not dispute the district court's alternative basis for granting the defendants' summary judgment motion with regard to the RICO claims. To prevail on their RICO claim, Mr. Moore, Mrs. Scroggs, and I-85 Garage had to show they suffered an injury "by reason of" the defendants' RICO Act violations. A plaintiff meets the "by reason of" requirement if he shows a "sufficiently direct injury" from the RICO violations and "proximate cause." *Williams*, 465 F.3d at 1287. The district court concluded that the plaintiffs had not met the "by reason of" requirement because "[o]ther than the witness tampering at the recall hearing, all of the alleged predicate acts occurred *after*" the defendants removed I-85 Garage from the towing list. *See* R. 2:67 at 32. This was an alternative and independent basis for granting summary judgment on the plaintiffs' RICO claim. Yet, in their initial brief, the plaintiffs spend little ink on this issue, saying in conclusory fashion that the defendants "caused injury to I-85, Mr. Moore's business." Br. of Appellants at 34. "Issues raised in a perfunctory manner, without supporting arguments and citation to authorities are generally deemed to be waived." *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). Hence, the plaintiffs have waived their causation argument, and we uphold the district court's

13

alternative ruling as well.

IV

The district court's decision to grant the defendants' summary judgment motion is affirmed.

**AFFIRMED.**